Sullivan
No. 83-429

## George Smith

v.

## The State of New Hampshire

December 31, 1984

*Brown & Nixon P.A.*, of Manchester (*David W. Hess* on the brief and orally), for the plaintiff.

*Gregory H. Smith*, attorney general (*Martin R. Jenkins*, assistant attorney general, and *David K. Mulhern*, attorney, on the brief, and *Mr. Jenkins* orally), for the State.

SOUTER, J.   The plaintiff appeals a judgment under former RSA 249:38 (now RSA 236:39), rendered on a counterclaim filed against him by the State to recover the cost of repairing damage to a bridge and highway. At trial the plaintiff urged that equitable considerations barred a finding of liability against him. He seasonably objected to certain evidence offered to prove damages and has appealed the award of them. We affirm the finding of liability but reverse the determination of damages and remand for a new trial on that issue.

At all relevant times the plaintiff has owned land through which the Sugar River flows, immediately east of a bridge and State highway designated as Routes 11 and 103 in Sunapee. In 1978 he used the land in his construction business and often traveled over the highway and bridge to move equipment from one side of the river to the other. To obviate such travel and to increase the area of his land, he wished to channel the river through two culverts laid parallel, each one hundred fifty feet long and seven-and-one-half feet in diameter, which he would then cover with gravel to join the two riverbanks. He spoke of his proposal to some members of the State Department of Public Works and Highways (the highway department), who expressed reservations about it. One of them advised the plaintiff that he would need a permit from the special board (the predecessor of the present wetlands board to which, for simplicity, we will hereafter refer). The plaintiff later discussed his proposal with other employees and officials of the highway department and informed them that he planned to get a permit from the board.

Late in the winter of 1979, the defendant applied to the board for a permit to dredge the riverbed, to install the culverts and to cover them with gravel. Because the plaintiff could not read or write, an employee of the board helped him to prepare the application, which included a rough sketch of the proposed location of the culverts in relation to the highway and bridge over the river. On March 13, 1979, the board granted the permit subject to conditions not in issue here. On the same day it granted a permit to the highway department to widen the bridge over the river, below the proposed site of the culverts.

By that time the culverts had been delivered to the riverbank. Later in March the State began the bridge project, and by April the plaintiff had begun to dredge the river to make way for the culverts. The board suspended his permit for a time due to excessive turbidity caused by the dredging, but by mid-April the board allowed the work to go forward. It did go forward, in full view of the employees and officials who were working on the bridge and inspecting the highway department's work.

On the evidence it could be found that the State finished work on the bridge before the plaintiff placed the culverts in the dredged riverbed, in May. When so placed, the ends of the culverts extended twenty feet within the State's property line and even beyond a line drawn between the ends of the bridge's wing dams. A representative of the board inspected the site and made no objection. The plaintiff then placed the fill over the culverts. Several employees or officials of the highway department saw the culverts in place during the spring and summer of 1979, but none of them expressed any objection to what he saw.

On March 4, 1981, at the site of the bridge, a patrolman from the highway department found a hole in the highway, four feet wide, six feet long and six or seven feet deep. It later appeared that soil had washed away under three quarters of the length of the bridge abutment and under twelve feet of the road.

After temporary repairs and a State survey of the area in April, the State and the plaintiff each learned for the first time that the culverts overshot the boundary by twenty feet. For several months thereafter the State asked the plaintiff to cut the ends of the culverts back to the property line, but the plaintiff would not. In the summer and fall of 1981 the State made extensive repairs and modifications to prevent further erosion of the road. In October the State began to excavate the area around the downstream ends of the culverts, so that it could cut the lower twenty feet from each of them.

The plaintiff then began this action by petitioning for an injunction against tampering with the culverts. The superior court granted a temporary restraining order. The State answered the petition and filed the counterclaim charging liability under the present RSA 236:39 for causing damage to the highway. After an evidentiary hearing on November 6, 1981, the Superior Court (*Nadeau,* J.) approved the recommendation of a Master (*Charles T. Gallagher,* Esq.) that the restraining order be lifted. The State then shortened the culverts and completed its other work on the bridge and road in December 1981.

In August 1983 the same master heard evidence on the counter-

claim. He recommended a verdict for the State in the amount of $20,000, and the Superior Court (*Johnson*, J.) ruled accordingly.

Under the plaintiff's first assignment of error, he argues that the actions of State officials raise an estoppel against the prosecution of the State's claim for damages. In essence the plaintiff argues that it would be inequitable to subject him to damages. He rests his position on dicta contained in *Appeal of John Denman*, 120 N.H. 568, 419 A.2d 1084 (1980), and on suggestions expressed in opinions in *Institute for Trend Research v. Griffin*, 101 N.H. 255, 139 A.2d 628 (1958) and *State v. Stafford Company*, 99 N.H. 92, 105 A.2d 569 (1954).

To assess the merits of the plaintiff's argument, we must begin with an analysis of the basis for the liability asserted under the statute now cited as RSA 236:39. This simply provides that "[i]f any person shall ... cause any defect ... or want of repair of a highway which renders it unsuitable for public travel, without authority, he shall be liable to the state for all damages to the highway ...." The master found liability under this statute because "the culverts speeded up the flow of the river and discharged the water with greatly increased force at a point very close to the bridge abutment. The culverts were the cause of the damage."

The plaintiff does not deny that there is an adequate evidentiary basis for this finding, and he does not claim that he had "authority" within the meaning of the statute. "Authority" that would bar liability under this statute is the subject of RSA 236:9, prohibiting the excavation or disturbance of "shoulders, ditches, embankments or the surface" of certain highways "without written permission from the state commissioner of public works and highways or his division engineer." The plaintiff had no such written permission.

Nor did the written permit from the predecessor of the wetlands board purport to provide authority to affect the bridge or highway. Neither the plaintiff's application nor the board's permit referred to RSA chapter 236. The application referred to highways only in describing the location of the project proposed, and the permit did not refer to highways at all. By its express terms, the permit was issued under RSA chapter 483-A and purported to authorize nothing but dredging and filling. Consequently it would be unreasonable to construe the scope of the permit more broadly than the scope of its terms or more broadly than the scope of the cited statute, which deals with the protection of wetlands, not with the condition of highways. RSA 483-A:1-b. Indeed, the plaintiff does not claim that his permit suggested that he had any positive authority to affect a highway in any manner.

It is clear, then, that neither the permit nor the terms of the stat-

utes that we have discussed support any equitable argument against charging the plaintiff for damage to the highway. Such an argument must therefore rest, if at all, on the more general claim that the plaintiff should be free of liability because no State official asked him to do more than he did do, and because no State official raised any objection once the final placement of the culverts was apparent. The plaintiff makes much of the fact that no one representing the State ever suggested that he should have placed his culverts differently to avoid risking damage to the highway. In essence he argues that because the State failed to object when he could have modified his plans to prevent both the encroachment upon the boundary and the damage to the highway, it would be inequitable to allow the State to charge him with the encroachment and damage after the fact.

A fundamental weakness affects this argument, however. It assumes that State officials should have objected at the earlier time. But there is no reason that they should have objected unless they had reason to believe that placement of the culverts would encroach on the boundary and cause the damage, and on that issue the record is silent. The plaintiff did not request such a finding, and the master made none. It does not follow from the facts as found that any State official should have anticipated the havoc that occurred, and it is therefore wrong to suggest that the State unfairly sat silently when it could have objected and prevented the harm. Since there is no basis to tax the State with anticipating the damage, the best that can be said for the plaintiff is that the equities are balanced between him and the State.

Given this conclusion, the authorities he relies upon are no help to him, even on the most expansive reading. In the earliest case he cites, *State v. Stafford Company*, 99 N.H. at 99–100, 105 A.2d at 574, this court suggested in dictum that the parties should try to reach an equitable settlement of a dispute after the plaintiff had acted in good faith reliance upon a State official's ultra vires agreement. In both the succeeding cases of *Institute for Trend Research v. Griffin*, 101 N.H. at 257, 139 A.2d at 629, and *Appeal of John Denman*, 120 N.H. at 573, 419 A.2d at 1088, the court commented on the equity favoring the position of a taxpayer who had acted in accordance with an express statement by a State official about the tax consequences of the transactions in question. In contrast, the plaintiff in this case can point to no such express agreement or representation. Therefore the cited cases do not justify the plaintiff's hopes in this appeal. *See City of Concord v. Tompkins*, 124 N.H. 463, 471 A.2d 1152 (1984).

We are left simply with the master's finding that the plain-

tiff's actions damaged the highway. There was no inequity and no error when the master applied the statute to hold the plaintiff liable for the damage.

Determining the cost of repairing of that damage presents two other issues, however, on which the plaintiff's arguments have merit. First, the plaintiff claims that the master erred in overruling an objection to the admission of what was described as an invoice addressed from the highway department to the plaintiff claiming $30,086.50 to be due in damages. Attached to the invoice was a terse breakdown of that figure into components for labor, materials, and so on. The witness who presented it explained that when the department intends to charge someone for the cost of repairs, it routinely prepares such an invoice at the conclusion of the work, and that the amount of the invoice is supposed to be the total of the costs to be charged off. In the words of the same witness, the invoice was offered to indicate "the cost to the State . . . to perform the work" on the bridge and highway after the damage. The plaintiff objected because the witness had not prepared the invoice, and because no witness was subject to cross-examination on it. The invoice was therefore hearsay, and objectionable unless rescued by some exception to the rule.

The State claims that the invoice was properly admitted under RSA 521:2 as a record "made in the regular course of business." This position ignores the fact that the statutory requirements for admissibility as a business record include the condition that the "record of an act, condition or event" must have been made "at or near the time of the act, condition or event." *Id.* Therefore, a court cannot rule on the admissibility of a business record without reference to the "act, condition or event" which the proponent seeks to prove by offering the record.

In this instance, the State offered the invoice to prove the amount of costs incurred by the State in the repair. But the invoice is not a direct record of such costs, and it was not even claimed to have been prepared "at or near the time" the various costs were incurred. There may be such records in the State's files, in the form of records of work assignments, or of the delivery of materials and so on, made around the time of the assignments and deliveries. *See Corey Steeplejacks Co. v. Cray*, 106 N.H. 126, 206 A.2d 617 (1965). But the invoice, by contrast, is merely a summary of such records and is not itself a business record admissible under the statute for the purpose of proving the amounts of the cost items.

The State then falls back to the position that the invoice

was admissible as a summary. A summary may be admitted, of course, if its accuracy as a summary of admissible evidence can be established. *See Dana A. Wein & Sons v. Keller,* 118 N.H. 545, 391 A.2d 878 (1978). In practice, the primary evidence itself is often admitted. Under Rules 1006 of the Federal Rules of Evidence and of the proposed New Hampshire Rules of Evidence, the material summarized must at least be available for examination and copying. In this case the plaintiff's counsel indicated that he might have waived any right to inspect and copy the primary records if he could have cross-examined the person who had prepared the summary. He could not even do that, however, because the State's witness had not prepared the summary and was not familiar with the actual business records. Since there was no opportunity here to inspect and copy the primary records, as a basis to challenge the reliability of the summary, the invoice was inadmissible as a summary. Since the award of damages was based on this evidence, we must vacate the verdict.

Even if the invoice had been admissible, a further flaw would have infected the calculation of damages. The master found that some of the State's work on the riverbed, bridge and road in 1981 had been improvement, as distinguished from repair. He stated that there was "no precise way of allocating" the State's expenditures as between repairs and improvements. He stated that the State had failed to convince him that more than $20,000 "represents damages," and so awarded a verdict in that amount. The plaintiff naturally accepts the master's conclusion that not all of the State's expenditures were for repairs, but he claims that the decision to divide the claim as the master did is inconsistent with the claimant's obligation to prove the amount of damages.

■ The master's statement is subject to varying interpretations. He may have intended to allude to the rule that absolute mathematical certainty is not required for a valid damage award. *See Petrie-Clemons v. Butterfield,* 122 N.H. 120, 441 A.2d 1167 (1982). But we think the more reasonable reading is that the evidence before the master did not indicate where the line should be drawn. Since the State had the burden to provide evidence on which such a line could be drawn, *Grant v. Town of Newton,* 117 N.H. 159, 370 A.2d 285 (1977), we must not allow the verdict of $20,000 to stand.

In determining what relief we should order, we note that this is not a case in which there was an absence of evidence on damages. *Cf. Hangar One, Inc. v. Davis Associates, Inc.,* 121 N.H. 586, 431 A.2d 792 (1981); *Pugliese v. Town of Northwood,* 119 N.H. 743, 408 A.2d 113 (1979). We therefore believe that reversal without retrial

would be inappropriate. Instead we remand for retrial on the issue of damages. The State will have the burden to provide evidence of damages and evidence on which the trier of fact can distinguish between expenditures for repairs and expenditures for improvements not required by the culverts in their truncated condition.

*Determination of damages reversed; remanded.*

KING, C.J., did not sit; the others concurred.