Strafford
No. 83-375

## HYDRAFORM PRODUCTS CORPORATION

### v.

## AMERICAN STEEL & ALUMINUM CORPORATION
### August 16, 1985

188

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Bartram C. Branch* and *Raymond E. Liguori* on the brief, and *Mr. Liguori* orally), for the plaintiff.

*Sheehan, Phinney, Bass & Green P.A.*, of Manchester (*Thomas H. Richards* and *Peter S. Cowan* on the brief, and *Mr. Cowan* orally), for the defendant.

SOUTER, J.   The defendant, American Steel & Aluminum Corporation, appeals from the judgment entered on a jury verdict against it. The plaintiff, Hydraform Products Corporation, brought this action for direct and consequential damages based on claims of

negligent misrepresentation and breach of a contract to supply steel to be used in manufacturing woodstoves. American claims that prior to trial, the Superior Court (*Nadeau*, J.) erroneously held that a limitation of damages clause was ineffective to bar the claim for consequential damages. American further claims, *inter alia*, that the Trial Court (*Dalianis*, J.) erred (a) in allowing the jury to calculate lost profits on the basis of a volume of business in excess of what the contract disclosed and for a period beyond the year in which the steel was to be supplied; (b) in allowing the jury to award damages for the diminished value of the woodstove division of Hydraform's business; (c) in failing to direct a verdict for the defendant on the misrepresentation claim; and (d) in allowing Hydraform's president to testify as an expert witness. We hold that the trial court properly refused to enforce the limitation of damages clause, but we sustain the other claims of error and reverse the judgment.

Hydraform was incorporated in 1975 and began manufacturing and selling woodstoves in 1976. During the sales season of 1977–78 it sold 640 stoves. It purchased steel from a number of suppliers until July 1978, when it entered into a "trial run" contract with American for enough steel to manufacture 40 stoves. Upon delivery of the steel, certain of Hydraform's agents and employees signed a delivery receipt prepared by American, containing the following language:

> "Seller will replace or refund the purchase price for any goods which at the time of delivery to buyer were damaged, defective or not in conformance with the buyer's written purchase order, provided that the buyer gives seller written notice by mail of such damage, defect or deviation within 10 days following its receipt of the goods. *In no event shall seller be liable for labor costs expended on such goods or other consequential damages.*"

(Emphasis added.)

When some of the deliveries under this contract were late, Hydraform's president, J. R. Choate, explained to an agent of American that late deliveries of steel during the peak season for manufacturing and selling stoves could ruin Hydraform's business for a year. In response, American's agent stated that if Hydraform placed a further order, American would sheer and stockpile in advance, at its own plant, enough steel for 400 stoves, and would supply further steel on demand. Thereafter Hydraform did submit a purchase order for steel sufficient to manufacture 400 stoves, to be delivered in four equal installments on the first days of September, October, November and December of 1978.

American's acceptance of this offer took the form of deliveries accompanied by receipt forms. The forms included the same language limiting American's liability for damages that had appeared on the receipts used during the trial run agreement. Hydraform's employees signed these receipts as the steel was delivered from time to time, and no one representing Hydraform ever objected to that language.

Other aspects of American's performance under the trial run contract reoccurred as well. Deliveries were late, some of the steel delivered was defective, and replacements of defective steel were tardy. Throughout the fall of 1978 Mr. Choate protested the slow and defective shipments, while American's agent continually reassured him that the deficient performance would be corrected. Late in the fall, Mr. Choate finally concluded that American would never perform as agreed, and attempted to obtain steel from other suppliers. He found, however, that none could supply the steel he required in time to manufacture stoves for the 1978–79 sales season. In the meantime, the delays in manufacturing had led to cancelled orders, and by the end of the season Hydraform had manufactured and sold only 250 stoves. In September, 1979, Hydraform sold its woodstove manufacturing division for $150,000 plus royalties.

In December, 1979, Hydraform brought an action for breach of contract, which provoked a countersuit by American. In January, 1983, American moved to dismiss Hydraform's claims for consequential damages to compensate for lost profits and for loss on the sale of the business. American based the motion on the limitation of damages clause and upon its defense that Hydraform had failed to mitigate its damages by cover or otherwise. In February, 1983, Hydraform's pretrial statement filed under Superior Court Rule 62 disclosed that it claimed $100,000 as damages for lost profits generally and $220,000 as a loss on the sale of the business. Later in February, 1983, the superior court permitted Hydraform to amend its writ by adding further counts, which included claims for fraudulent and negligent misrepresentation. Hydraform did not, however, proceed to trial on the claim of fraud.

In April, 1983, *Nadeau*, J., denied American's motion to dismiss the claims for consequential damages. He relied on the Uniform Commerical Code as adopted in New Hampshire, RSA chapter 382–A, in ruling that the limitation of damages clause was unenforceable on the alternative grounds that the clause would have been a material alteration of the contract, *see* RSA 382–A:2–207(2)(b), or was unconscionable or was a term that had failed of its essential purpose, *see* RSA 382–A:2–719(2) and (3). He further concluded that,

under the circumstances of the case, the failure to cover, if proven, would not bar consequential damages.

The case was tried to a jury before *Dalianis*, J. American's exceptions at trial are discussed in detail below. At the close of the evidence, American objected to the use of a verdict form with provision for special findings, and the case was submitted for a general verdict, which the jury returned for Hydraform in the amount of $80,245.12.

American's first assignment of error for our consideration challenges the trial court's refusal to recognize the provision insulating American from liability for consequential damages caused by defective goods. We hold that the trial court was correct.

To begin with, we think the trial court was correct in construing the quoted language in question as a single provision. Theoretically, of course, it can be analyzed as two distinct terms, the first providing for replacement or refund if the buyer gives notice of non-conformance within ten days of receipt, the second precluding recovery of certain labor costs and general consequential damages. However, the fact that the terms were placed together confirms what we believe is the more reasonable interpretation, that the parties were agreeing to eliminate a right to consequential damages for the very reason that replacement or refund would operate as effective remedies. Therefore, we are unable to view this as a case in which the status of the limitation of damages clause should be determined independently of the provision for replacement or refund.

Thus reading the provision as a unity, we believe that it became a term of the parties' contract. RSA 382–A:2–207(1) contemplates that an offeree's reply may operate as an acceptance, even though it proposes a term additional to or different from the terms of the offer. When the parties are merchants the additional term becomes a part of the contract unless the offer itself precludes such an addition, or the new term would be a material alteration of the contract, or the offeror seasonably objects. *Id.* at 2–207(2).

In this case, the trial court found that the parties did not dispute their merchant status. Since the offer contained no preclusion and since Hydraform never objected to the new provision, the limitation must have become a term of the contract unless it worked a material alteration. We conclude that it did not.

Official comment 4 to § 2–207 implies that the test for material alteration is whether the term in question would result in surprise or hardship if incorporated in the contract without the express

assent of the party placed at a disadvantage by it. While this standard may seem to beg the question, comment 5 notes that a limitation of remedy that is otherwise reasonable under §§ 2–718 and 2–719 of the Code is not considered to be unreasonably surprising. It thus becomes a term of the contract in the absence of preclusion in the original offer or seasonable objection by the offeror. Since § 2–718 is not applicable here, the issue of material alteration turns on whether the term is reasonable when judged under the standard of § 2–719.

The relevant portions of § 2–719 are these:

"(1) Subject to the provisions of subsections (2) and (3) . . .

(a) the agreement . . . may limit . . . the measure of damages recoverable . . . as by limiting the buyer's remedies to . . . replacement of non-conforming goods . . . ; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.

(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not."

As subsection (3) provides, a limitation or exclusion of consequential damages is enforceable unless unconscionable, but such a term is not prima facie unconscionable where the consequential loss is commercial. RSA 382–A:2–719(3). Since the loss in question here was commercial, the exclusion was not prima facie unconscionable, and we are left with the question whether there is reason otherwise to hold the exclusion unconscionable. To answer this question we turn again to the official comments of the Code.

The comments to § 2–302 of the Code state that unconscionability is a one-sidedness that must be assessed as tolerable or not "in the light of the general commercial background and the commercial needs of the particular trade or case . . . . The principle is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power." RSA 382–A:2–302 comment 1 (citations omitted); *see American Home Improvement Co. v. MacIver*, 105 N.H. 435, 439, 201 A.2d 886,

888–89 (1964); *Dow Corning Corporation v. Capital Aviation, Inc.*, 411 F.2d 622, 626 (7th Cir. 1969); *Williams v. Walker-Thomas Furniture Company*, 350 F.2d 445, 450 (D.C. Cir. 1965).

■■■ Within this general framework, courts dealing with unconscionability claims have espoused the principle that the parties ought to be left free to make their own agreements in the absence of fraud or patent overreaching. *Kansas City Structural Steel Co. v. L. G. Barcus & Sons, Inc.*, 217 Kan. 88, 95, 535 P.2d 419, 424 (1975). Such overreaching may occur when one party is vastly more experienced than the other. *See id.; cf. Cryogenic Equipment, Inc. v. Southern Nitrogen, Inc.*, 490 F.2d 696, 699 (8th Cir. 1974) (where negotiator on each side was highly experienced and no evidence of disparate bargaining power, limitation of remedy not unconscionable); *K & C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 308–09, 263 A.2d 390, 393 (1970) (based upon parties' prior experience, exclusion of consequential damages was an allocation of risk and was not unconscionable). But the most common indicator of overreaching, or its absence, is the relative bargaining power of the two parties. *See, e.g., Cryogenic Equipment, Inc. v. Southern Nitrogen, Inc. supra.*

■■■ As we have seen already, however, the superior bargaining power of the favored party by itself is not enough to taint a limitation clause. Nor is difference in size enough to establish unequal bargaining power. *Cailler v. Humble Oil & Refining Co.*, 117 N.H. 915, 919, 379 A.2d 1253, 1256 (1977). The issue of overreaching therefore tends to turn on whether the bargaining power is so disparate that the weaker party is left without any genuine choice. *See Williams v. Walker-Thomas Furniture Company, supra* at 449; *Pittsfield Weaving Co., Inc. v. Grove Textiles, Inc.*, 121 N.H. 344, 346, 430 A.2d 638, 639 (1981). Such a conclusion is difficult to draw when the favored party has competitors with whom the other party may deal. *See County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F. Supp. 1300, 1308 (S.D.N.Y. 1970), *aff'd*, 444 F.2d 372 (2d Cir.), *cert. denied*, 404 U.S. 939 (1971); *Cailler v. Humble Oil & Refining Co. supra.*

In the light of these standards for assessing claims of unconscionability resulting from overreaching, we do not find the present clause unconscionable. It is apparent from the testimony of Hydraform's president that he was not an innocent in the industry. While we may assume that American is the larger company, Hydraform had access to American's competitors and had dealt with them

before. Thus, the record would not support a finding that Hydraform had no alternative to dealing with American.

■ Nor would any circumstances of the dealings of these parties support a finding of unconscionability. American had used the term in question in the course of the trial run contract, and it was reasonable to expect that American would continue to contract on that basis. Therefore, there was no surprise or reason for claiming that American was attempting to add a term after performance had been completed in whole or in part by delivery of the goods ordered. Responsible officials of Hydraform had signed the forms containing the term, and Mr. Choate knew from past experience that late delivery was both a serious danger to his business and a genuine risk when dealing with American. Since Hydraform began to accept goods in these circumstances and thereby assented to the limitation clause, there is no reason to declare that the clause was unconscionable, that is, unreasonble under § 2-719(3). It follows that the clause should not be classified as unreasonably surprising or as a material alteration within the meaning of § 2-207(2)(b). Hence, the clause was initially enforceable as a term of the contract. *Id.*

It is quite another question, however, whether the clause remained enforceable under the terms of § 2-719(2). This section provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose" the clause in effect must be set aside, leaving a party free to pursue remedies otherwise available under article two of the Code, including consequential damages. We are satisfied that the record amply supports the trial court's conclusion that the circumstances in this case did cause the exclusive remedy clause to fail of its purpose.

The purpose of the clause was to limit the right to seek consequential damages, but only subject to American's obligation to provide replacements as a remedy for defective goods. It is apparent, however, that the limitation clause did not address the problem of late shipment at all. It is equally apparent that if replacement is to be an appropriate response to the delivery of defective materials to a seasonal manufacturing business, the replacement must be prompt. Thus, if American delayed the basic shipments or the required replacements, the clause would fail of its essential purpose to provide some effective remedy for breach. Time was of the essence, and delay of a replacement shipment would negate its adequacy. *Cf. Xerox Corp. v. Hawkes*, 124 N.H. 610, 619-20, 475 A.2d 7, 11-12 (1984); *County Asphalt, Inc. v. Lewis Welding & Engineering Corp.*, 323 F. Supp. 1300, 1309 (S.D.N.Y. 1970).

In fact, the evidence indicates that neither the basic shipments nor the required replacements were timely. For both those reasons, the clause failed. Hydraform would have been left without any effective remedy if the limitation clause had been enforced, and therefore the trial court committed no error in refusing to enforce it.

Since the clause was not enforceable, the trial court allowed the jury to consider Hydraform's claims for lost profits in the year of the contract, 1978, and for the two years thereafter, as well as its claim for loss in the value of the stove manufacturing business resulting in a lower sales price for the business in 1979. American argues that the court erred in submitting such claims to the jury, and rests its position on three requirements governing the recovery of consequential damages.

First, under RSA 382–A:2–715(2)(a) consequential damages are limited to compensation for "loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know . . . ." This reflection of *Hadley v. Baxendale*, 156 Eng. Rep. 145 (1854), thus limits damages to those reasonably foreseeable at the time of the contract. *See Gerwin v. Southeastern Cal. Ass'n of Seventh Day Adventists*, 14 Cal. App. 3d 209, 220, 92 Cal. Rptr. 111, 118 (1971); *Petrie-Clemons v. Butterfield*, 122 N.H 120, 124, 441 A.2d 1167, 1170 (1982). To satisfy the foreseeability requirement, the injury for which damages are sought "must follow the breach in the natural course of events, or the evidence must specifically show that the breaching party had reason to foresee the injury." *Salem Engineering & Const. Corp. v. Londonderry School Dist.*, 122 N.H. 379, 384, 445 A.2d 1091, 1094 (1982). Thus, peculiar circumstances and particular needs must be made known to the seller if they are to be considered in determining the foreseeability of damages. *Lewis v. Mobil Oil Corporation*, 438 F.2d 500, 510 (8th Cir. 1971).

Second, the damages sought must be limited to recompense for the reasonably ascertainable consequences of the breach. *See* RSA 382–A:2–715, comment 4. While proof of damages to the degree of mathematical certainty is not necessary, *Smith v. State*, 125 N.H. 799, 805, 486 A.2d 289, 294 (1984), a claim for lost profits must rest on evidence demonstrating that the profits claimed were "reasonably certain" in the absence of the breach. *Whitehouse v. Rytman*, 122 N.H. 777, 780, 451 A.2d 370, 372 (1982). Speculative losses are not recoverable.

Third, consequential damages such as lost profits are recoverable only if the loss "could not reasonably be prevented by

cover or otherwise." § 2–715(2)(a). *See* § 2–712(1) (*i.e.*, by purchase or contract to purchase goods in substitution for those due from seller). In summary, consequential damages must be reasonably foreseeable, ascertainable and unavoidable.

Applying these standards, we look first at the claim for lost profits for the manufacturing season beginning in September, 1978. There is no serious question that loss of profit on sales was foreseeable up to the number of 400 stoves referred to in the contract, and there is a clear evidentiary basis for a finding that Hydraform would have sold at least that number. There was also an evidentiary basis for the trial court's ruling that Hydraform acted reasonably even though it did not attempt to cover until the season was underway and it turned out to be too late. American had led Hydraform on by repeatedly promising to take steps to remedy its failures, and the court could find that Hydraform's reliance on these promises was reasonable up to the time when it finally and unsuccessfully tried to cover.

■ Lost profits on sales beyond the 400 stoves presents a foreseeability issue, however. Although American's agent had stated that American would supply steel beyond the 400 stove level on demand, there is no evidence that Hydraform indicated that it would be likely to make such a demand to the extent of any reasonably foreseeable amount. Rather, the evidence was that Mr. Choate had told American's agent that the business was seasonal with a busy period of about four months. The contract referred to delivery dates on the first of four separate months and spoke of only 400 stoves. Thus, there appears to be no basis on which American should have foreseen a volume in excess of 400 for the season beginning in 1978. Lost profits for sales beyond that amount therefore were not recoverable, and it was error to allow the jury to consider them.

■ Nor should the claims for profits lost on sales projected for the two subsequent years have been submitted to the jury. The impediment to recovery of these profits was not total unforeseeability that the breach could have effects in a subsequent year or years, but the inability to calculate any such loss with reasonable certainty. In arguing that a reasonably certain calculation was possible, Hydraform relies heavily on *Van Hooijdonk v. Langley*, 111 N.H. 32, 274 A.2d 798 (1971), a case that arose from a landlord's cancellation of a business lease. The court held that the jury could award damages for profits that a seasonal restaurant anticipated for the three years that the lease should have run. It reasoned that the experience of one two-month season provided sufficient data for a reasonably cer-

tain opinion about the extent of future profits. The court thus found sufficient certainty where damages were estimated on the basis of one year of operation and profit, as compared with no operation and hence no profit in the later years.

Hydraform's situation, however, presents a variable that distinguishes it from *Van Hooijdonk*. In our case the evidence did not indicate that American's breach had forced Hydraform's stove manufacturing enterprise out of business, and therefore the jury could not assume that there would be no profits in later years. Without that assumption the jury could not come to any reasonably certain conclusion about the anticipated level of sales absent a breach by American. The jury could predict that Hydraform would obtain steel from another source and would be able to manufacture stoves; but it did not have the evidence from which to infer the future volume of manufacturing and sales. Thus, it could not calculate anticipated lost profits with a reasonable degree of certainty.

There is, moreover, a further reason to deny recovery for profits said to have been lost in the later years. Although Hydraform's pretrial statement disclosed that Hydraform claimed $100,000 in lost profits, it did not indicate that the claim related to the seasons beginning in 1979 and 1980. Since the pretrial statement also listed a claim for loss of the value of the business at the time of its sale in 1979, we believe that the statement could reasonably be read as claiming lost profit only for the one year before the business was sold. Therefore the claim for profits in 1979 and 1980 should have been disallowed for failure to disclose the claim as required by Superior Court Rule 62.

We consider next the claim for loss in the value of the business as realized at the time of its sale in 1979. As a general rule, loss in the value of a business as a going concern, or loss in the value of its good will, may be recovered as an element of consequential damages. *See Salem Engineering & Const. Corp. v. Londonderry School Dist.*, 122 N.H at 384, 445 A.2d at 1094; *Salinger v. Salinger*, 69 N.H. 589, 591–92, 45 A. 558, 559–60 (1899); *see also* J. STORY, PARTNERSHIP § 99, at 169–70 (6th ed. 1868).

In this case, however, it was error to submit the claim for diminished value to the jury, for three reasons. First, to the extent that diminished value was thought to reflect anticipated loss of profits in future years, as a capitalization of the loss, it could not be calculated with reasonable certainty for the reasons we have just discussed. Second, even if such profits could have been calculated in this case, allowing the jury to consider both a claim for diminished

value resting on lost profits and a claim for the lost profits themselves would have allowed a double recovery. *See Westric Battery Co. v. Standard Electric Co., Inc.*, 522 F.2d 986, 989 (10th Cir. 1975). Third, to the extent that diminished value was thought to rest on any other theory, there was no evidence on which it could have been calculated. There was nothing more than Mr. Choate's testimony that he had sold the business in September of 1979 for $150,000 plus minimum royalties, together with his opinion that the sales price was less than the business was worth. This testimony provided the jury with no basis for determining what the business was worth or for calculating the claimed loss, and any award on this theory rested on sheer speculation.

In summary, we hold that the jury should not have been allowed to consider any contract claim for consequential damages for lost profits beyond those lost on the sale of 150 stoves, the difference between the 400 mentioned in the contract and the 250 actually sold. Nor should the trial court have allowed the jury to consider the claim for loss in the value of the business.

We turn now to American's argument that the court should have directed a verdict for it on the count for negligent misrepresentation. The misrepresentation claim rested on the statement allegedly made by American's agent in the aftermath of the trial run contract. The statement was that if Hydraform would contract for the purchase of further steel, American would sheer and store enough for 400 stoves prior to September 1, 1978, and would supply additional steel beyond that amount on demand.

American's claim of error is best approached by considering the basic elements of the tort: the defendant's negligent misrepresentation of a material fact and the plaintiff's justifiable reliance on that misrepresentation. *Ingaharro v. Blanchette*, 122 N.H. 54, 57, 440 A.2d 445, 447 (1982). While a promise is not a statement of fact and hence cannot, as such, give rise to an action for misrepresentation, a promise can imply a statement of material fact about the promisor's intention and capacity to honor the promise. *See* W. PROSSER, THE LAW OF TORTS 762–63 (5th ed. 1984). It follows that mere proof of breach of promise, whether or not the promise is a contractual term, will not support an action for misrepresentation. *See Munson v. Raudonis*, 118 N.H. 474, 477, 387 A.2d 1174, 1176 (1978); W. PROSSER, *supra* at 764. Otherwise every contract action would automatically acquire a tandem count in tort, and the tort claim would render nugatory any contractual limitation on liability. *See Tareyton Electronic Composition, Inc. v. Eltra Corp. v. Tareyton*

*Corp.*, 21 U.C.C. Rep. Serv. (Callaghan) 1064, 1079 (M.D.N.C. 1977); *Investors Premium Corp. v. Burroughs Corp.*, 389 F. Supp. 39, 45–46 (D.S.C. 1974); *Mooney v. State Farm Insurance Companies*, 344 F. Supp. 697, 700 (D.N.H. 1972).

Measured against these principles, the statement allegedly made by American's agent was in the form of a promise, but it implied that American had the capacity and the intention to sheer and store the amount of steel in question and to provide more if requested. Thus it could have supported the conclusion that the defendant made a factual representation. There is no evidence, however, from which the jury could have concluded that the implicit representations were made falsely. The evidence is sufficient to prove only that American breached its promises, not that it initially lacked the capacity or intent to perform them. Therefore, considering the evidence in the light most favorable to Hydraform, a reasonable jury could not find that the element of false factual representation had been proven, and a verdict should have been directed for American on this count. *See Reid v. Spadone Mach. Co.*, 119 N.H. 457, 462, 404 A.2d 1094, 1097 (1979); *Sargent v. Alton*, 102 N.H. 476, 478, 160 A.2d 345, 346 (1960); R. WIEBUSCH, 5 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 1578, at 294 (1984).

The remaining issue to be considered in this appeal is academic so far as any possible retrial of this case is concerned, but we will nevertheless deal with it for its value in future cases. American objected to the trial court's decision to allow Mr. Choate to give opinion evidence as an expert witness. The only ground for this objection that we find well-taken was Hydraform's failure to disclose in advance of trial that Mr. Choate would offer opinion testimony.

In *Willett v. General Electric Co.*, 113 N.H. 358, 360, 306 A.2d 789, 791 (1973), we held that as a matter of course a party may discover (a) the names of those whom his adversary intends to call to give opinion evidence as experts, (b) the substance of the facts and opinions about which they are expected to testify, and (c) the basis for their opinions. American served standard interrogatories on Hydraform seeking this information, but Hydraform failed to respond that Mr. Choate would testify as an expert and failed to provide the substance and basis for any opinions he might offer. We believe that this was error on Hydraform's part.

Hydraform's failure to list Mr. Choate as an expert may well exemplify common practice, for Mr. Choate was doubtless regarded as a party, rather than as an independent expert. Clearly,

no sharp practice was intended in this case. But, Mr. Choate did function as an expert, and the policy of disclosure that underlies *Willett* is as applicable when a party acts as expert as it is when the opinion testimony is to come from an outsider. Hence we caution counsel to make full disclosure when identification of experts is called for by interrogatories. Without good reason to excuse a failure to make such disclosure, a trial court should sustain an opposing party's objection to the opinion testimony of a proffered expert.

Having found error, we reverse. We do not remand for an immediate new trial, however, for we believe that the trial court should first consider the propriety of a remittitur. The trial judge should determine whether on the evidence before it the jury could reasonably have found liability under the tort claim without finding liability under the contract claim as well. If it could not have, and a finding of contract liability is therefore reasonably certain, then the court may consider a remittitur to the amount of a contract verdict that would be consistent with the evidence and this opinion. There was evidence that the average profit per stove was $284.26 and that the difference between actual sales and foreseeable sales in the absence of breach was 150 stoves. Thus if the trial court finds a remittitur otherwise appropriate, a reduction of the verdict to $42,639 would be warranted.

*Reversed.*

All concurred.