Kalik v. Abacus Exchange                    CV-99-421-M    10/19/01

UNITED STATES DISTRICT COURT

                        DISTRICT OF NEW HAMPSHIRE


Allen M. Kalik and Patricia G. Kalik,
      Plaintiffs


      v.                                    Civil No. 99-421-M
                                            Opinion No. 2001 DNH 192

Abacus Exchange, Inc.,
      Defendant


                            **O R D E R**


      Allen and Patricia Kalik bring this diversity action against

Abacus Exchange, Inc., seeking damages for its alleged breach of

contract and violation of New Hampshire's Consumer Protection

Act.[1]  Defendant denies any wrongdoing and has itself filed

several counterclaims, claiming that it was plaintiffs who

breached the contract and, in so doing, violated the Consumer

---

      [1]    Although plaintiffs' complaint names "Abacus Exchange,
Inc." as the defendant, it appears that entity no longer exists.
The record suggests that in June of 1999, it was merged with
Abacus Investors, Inc.  Subsequently, the assets formally owned
by Abacus Exchange were transferred to Abacus Communications LC.
"Because the entity Abacus Exchange, Inc. no longer exists,
Abacus Communications LC is identified as the defendant in its
Answer, Affirmative Defenses, and Counterclaim."  Defendant's
Answer (document no. 24) at 1 n.1.

Protection Act. Presently pending is plaintiffs' motion for summary judgment as to four of defendant's five counterclaims.

## Standard of Review

When ruling upon a party's motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." Intern'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Center, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

## Background

On July 1, 1998, Allen and Patricia Kalik and Abacus Exchange, Inc. executed a "Stock Purchase Agreement," pursuant to which Abacus agreed to purchase from the Kaliks all of the outstanding shares of Executive Exchange, Inc. (the "Company"). The Agreement provided a purchase price of "a maximum of Thirteen Million Dollars." Exhibit A-14 to plaintiffs' memorandum (document no. 28), Stock Purchase Agreement at section 1.4.1.1. Specifically, it provided that $10,400,000 was due at closing, with the remaining $2,600,000 payable in installments, subject to the Company reaching certain specified income milestones during the first and second years of operation by the new owner. Id., at section 1.4.1.2. The Kaliks claim the Company met those milestones and, therefore, say they are entitled to payment of the full outstanding amount provided for by the Agreement. They say that by refusing to pay the full amount required under the Agreement, and by engaging in other allegedly wrongful conduct, Abacus breached various provisions of the Agreement and violated New Hampshire's Consumer Protection Act.

Abacus, on the other hand, denies that the Company met the earnings milestones that would have triggered its obligation to pay the Kaliks the full amount specified in the Agreement and says it paid plaintiffs all the monies to which they were entitled, in light of the Company's lower earnings. That dispute is presently the subject of arbitration, as called for under the terms of the Agreement. Additionally, however, Abacus has brought five counterclaims, four of which are the subject of plaintiffs' pending motion for summary judgment.

In its first counterclaim, Abacus says the Kaliks breached their express and implied obligations under the Agreement by failing to disclose (or affirmatively misrepresenting) certain material facts concerning the Company prior to closing and then by filing suit prior to submitting their claims to arbitration. Defendant's second counterclaim (intentional misrepresentation) and third counterclaim (negligent misrepresentation) are based upon the same alleged failures to disclose, or misrepresentations of, material facts. In its fourth counterclaim (captioned

4

"Restitution"), Abacus seeks roughly $70,000 it had to spend to extend the term of a software license that was critical to the continued operation of the Company. Finally, in its fifth counterclaim, Abacus seeks damages under the Consumer Protection Act for plaintiffs' alleged unfair and deceptive trade practices.

The Kaliks move for summary judgment as to all of Abacus's counterclaims except count four - the restitution claim. Abacus objects.

**Discussion**

I.  Breach of Contract and Misrepresentation Claims.

Abacus's first breach of contract claim alleges that the Kaliks "breached their contractual obligations by commencing this lawsuit rather than pursuing arbitration as contemplated by the Agreement." Defendant's Answer, Affirmative Defenses, and Counterclaims at para. 31. Its remaining breach of contract claims, as well as its intentional misrepresentation and negligent misrepresentation claims, all focus on the Kaliks'

5

alleged pre-closing misrepresentations concerning: (1) the state of the local labor market; (2) the nature of the Company's rights with respect to certain software licenses; and (3) promises made to an employee of the Company concerning the possible payment, following the successful sale of the Company, of a "bonus" or "reward" of approximately $100,000. In its memorandum in opposition to summary judgment, Abacus summarizes those claims as follows:

> In reaching its decision to pay up to $13 million for a company owned by the Kaliks, Abacus justifiably relied on representations made by the Kaliks. The most critical representations made by Allen Kalik to Abacus involved the ability of [the Company] to staff its business. Contrary to these express representations, the [Company] had experienced hiring difficulties only months earlier. If Abacus had been aware of these problems, it would not have paid the high price which it paid for the [Company]. Moreover, the Kaliks failed to disclose a promise to pay a former employee a substantial amount of compensation and failed to disclose that [the Company] was not the owner of certain software. These failures are contrary to express representations in the Agreement.

Defendant's memorandum (document no. 29) at 7.

A.   Governing Law.

New Hampshire law provides that, "the procuring of a contract or conveyance by means of fraud or negligent misrepresentation is an actionable tort."  Nashua Trust Co. v. Weisman, 122 N.H. 397, 400 (1982).  To prevail on its negligence claim, Abacus must point to "a negligent misrepresentation by the [Kaliks] of a material fact and justifiable reliance" upon that misrepresentation by Abacus.  Ingaharro v. Blanchette, 122 N.H. 54, 57 (1982).  See also Hydraform Products Corp. v. American Steel & Aluminum Corp., 127 N.H. 187, 200 (1985).  As to the intentional misrepresentation claim, it "must be proved by showing that the representation was made with knowledge of its falsity or with conscious indifference to its truth and with the intention of causing [defendant] to rely on the representation."  Patch v. Arsenault, 139 N.H. 313, 319 (1995).  See also Walker v. Percy, 142 N.H. 345, 351 (1997).  And, finally, a breach of contract occurs when "there is a failure without legal excuse, to perform any promise which forms the whole or part of a contract."

7

<u>Bronstein v. GZA GeoEnvironmental, Inc.</u>, 140 N.H. 253, 255 (1995)
(citation and internal quotation marks omitted).


    B.    <u>Failure to Arbitrate</u>.

The Agreement contemplates that the final series of post-closing payments to the Kaliks would be calculated based upon the Company's earnings during the first and second years following closing. It provides that at certain specified times, Abacus would engage the accounting firm of KPMG Peat Marwick to calculate the Company's earnings (the "EBITDA Computation") and provide copies of earnings statements to the Kaliks. If the parties cannot agree that the EBITDA Computation performed by the accounting firm is accurate, the Agreement provides that they will arbitrate their dispute(s). Agreement, section 1.4.1.4. As to all other disputes related to the sale of the Company, however, the Agreement contemplates that the parties may pursue available legal remedies in an appropriate judicial forum. <u>See</u> Agreement, sections 10.2 and 11.5.

8

In November of 1999, Abacus filed a motion seeking a stay of these proceedings pending arbitration of some of the parties' disputes. See Document no. 6. The court held a hearing on the matter, following which it stayed the case. On September 25, 2000, Abacus submitted an assented-to motion seeking an extension of the stay, in which it represented that "[t]he parties would like to have the opportunity to engage in the dispute resolution process contemplated by the Stock Purchase Agreement before undertaking the effort to prepare for trial." Document no. 26. The court granted that motion and, presumably, the parties are engaged in arbitration with respect to their dispute over the amounts due under the Agreement.

Abacus's sole remedy for the Kaliks' failure to arbitrate claims properly subject to the Agreement's arbitration provision is to seek a stay of these proceedings and an order compelling the Kaliks to arbitrate. See Demers Nursing Home, Inc. v. R.C. Foss & Son, Inc., 122 N.H. 757 (1982). See also N.H. Rev. Stat. Ann. ("RSA") 542:2 and 3 (providing that the remedy when a party

9

has refused to arbitrate under a binding arbitration clause is to stay any pending judicial proceedings and compel arbitration); 9 U.S.C. §§ 3 & 4 (same). Abacus has not pointed to any statute or precedent that even remotely suggests it is entitled to damages or attorneys' fees incurred as a result of the Kaliks' apparently premature efforts to sue.

Having successfully obtained a stay of litigation pertaining to the Kaliks' arbitrable claims in this court, and an order compelling them to arbitrate disputes related to the Company's post-closing earnings, Abacus has received all the relief to which it is entitled regarding its right to arbitration under the Agreement. Accordingly, its claim based on the Kaliks' alleged breach of the arbitration provision is moot.

C.  <u>The Software Issue.</u>

Defendant summarizes it claim concerning the software licensing issue as follows:

> In the Agreement, the Kaliks specifically represented
> and warranted that the company had "all right, title
> and interest to <u>or valid licenses of</u> all Intangible
> Property used in the conduct of the business as
> presently operated . . . [and that] the company owns or
> possess <u>adequate licenses or other rights to use all</u>
> <u>programs</u> . . . used to operate the business."
> Agreement § 2.22.  At the time of closing, Professional
> Inbound, Inc., which was owned or controlled by Allen
> Kalik, owned certain software licensed to [the
> Company].  The Agreement contains no restriction on the
> use of, or the length of, the license for that
> software.

Defendant's memorandum (document no. 29) at para. 16 (emphasis supplied).  While it is true that the Agreement does not address any limitation on the duration of the software license at issue, Abacus fails to acknowledge that, prior to closing, the Kaliks provided it with a copy of that software license, which was made a part of the closing binder.  That license plainly and unequivocally discloses its limited duration - two years.  <u>See</u> Exhibit A-4 to plaintiff's memorandum, Software License Agreement at § 5.  Accordingly, as represented in section 2.22 of the Agreement, the record reveals that the Company did in fact own or possess "adequate licenses . . . to use all programs . . . used to operate the business," and defendant's claim that the Kaliks

11

breached that section of the Agreement is wholly without merit. Defendant's breach of contract claim necessarily fails, as do its misrepresentation claims relating to the software licensing issue.

D.    The Employee Compensation Issue.

In support of its breach of contract and misrepresentation claims relating to the employee compensation issue, Abacus asserts that, "The Kaliks promised to pay Holzberg, an employee of the company, approximately $100,000 in the event of a sale of the [Company's] stock." Defendant's memorandum at 10. Allen Kalik describes that promise and the circumstances under which it was extended as follows:

> Michael Holzberg had been a valuable employee of [the Company] who had helped my wife and me expand the business. In recognition of these contributions, I discussed with Michael the possibility that I might personally reward him with a sum of money if [the Company] were sold. I did not, however, make any promises to Mr. Holzberg. My conversation with Mr. Holzberg is best described as casual. I never promised Mr. Holzberg that [the Company] would pay him anything beyond his normal compensation. It was clear that if I decided to pay Holzberg, this payment would come from

12

        my wife and me out of the proceeds of the sale, not as
        compensation from [the Company] or [defendant].

Kalik Affidavit at paras. 11-12.  No affidavit from Holzberg
himself has been submitted and the affidavits upon which Abacus
relies do not characterize Kalik's "promise" differently than
Kalik does in his own affidavit.  That is to say, defendant has
not submitted any evidence suggesting that Kalik obligated or
even purported to obligate the Company to give Holzberg any
additional salary, wages, commissions, or bonuses; instead,
defendant implicitly concedes that Kalik's statements to Holzberg
amounted, at most, to a unilateral offer (of questionable
enforceability) to reward Holzberg from Kalik's personal
resources, for his past years of loyal service to Kalik and the
Company.

        Importantly, however, the Agreement does not address such
personal payments of rewards (from Kalik's own funds) to current
or former employees.  Section 2.20.7 of the Agreement,
particularly when read in conjunction with the Agreement's

13

integration provision (section 11.5), clearly and unambiguously addresses only agreements made by the Company and/or the Kaliks, on behalf of the Company, to pay current or former employees wages, commissions, salaries, or other benefits (e.g., sick leave, pay in lieu of leave, etc.), other than current wages, salaries, and other benefits that are disclosed in Schedule 2.20. The pertinent portion of the Agreement provides:

> Schedule 2.20 lists the names and job titles of all employees of the Company as of May 31, 1998, the current salary, compensation, pay rate or hourly rate for each, per diem and other allowances and vacation, sick days for each (or paid days off in lieu thereof) assuming no vacation has been taken and the actual days off taken by each employee through May 31, 1998 and all anticipated increases in any of the foregoing. Each employee's length of service, employment commencement date and all relevant terms of their employment, including, without limitation, whether the employee is full or part time, salaried or hourly paid and the benefits received by such employee is set forth on Schedule 2.20. Except as listed and described on Schedule 2.20, neither the Company nor Sellers has any obligation or agreement to pay any current or former employee of the Company any amount after the date of this Agreement, except for current wages and commissions.

Agreement, section 2.20.7.

Defendant suggests that the phrase "any obligation or agreement to pay" an employee includes the gratuitous offer by Allen Kalik to personally reward Holzberg with a $100,000 payment, for past loyal services, out of Kalik's own proceeds from the sale. Such a broad reading of section 2.20.7 is, however, inconsistent with its plain meaning. That section of the Agreement addresses all forms of wages, salary, commissions, and other compensation owed by the Company to current or former employees. Schedule 2.20 details those obligations. Thus, when read in context, and in light of the provisions set forth in the Agreement's integration clause, it is plain that the words "any obligation or agreement to pay any current or former employee of the Company any amount" refers to wages, salary, and commissions. The phrase does not include within its scope gratuitous promises made by the Kaliks to bestow personal gifts upon former employees, at their own expense, with no obligation of any sort attaching to the Company.

Plainly, what the Agreement addresses (and what Abacus was legitimately concerned about identifying) are any and all obligations that the Company might have (or that the Kaliks, as its agents, might have assumed on behalf of the Company) to pay wages, salaries, and/or commissions to current or former employees beyond those disclosed in the pertinent schedules. That Allen Kalik might have gratuitously offered, from his personal resources, a cash gift to Holzberg (or a trip to Hawaii or a gold watch) for his years of loyal service was not an event that needed to be disclosed under section 2.20.7 of the Agreement. Consequently, the Kaliks' failure to disclose it does not constitute a breach. And, because that promise had no effect whatsoever on the Company or defendant, the Kaliks' failure to disclose it (even if disclosure had been required) cannot be deemed to have been material. Abacus's misrepresentation claims also necessarily fail.[2]

--------

[2]    Defendant vaguely suggests it deemed it necessary to purchase a release of claims from Holzberg relating to the "reward" referenced by Kalik. Nevertheless, nothing in the record suggests that defendant or the Company was in any way legally obligated to pay Holzberg the money allegedly offered by

16

E.   The Labor Market Issue.

Defendant's final claim relates to allegedly false statements made by the Kaliks concerning the pre-closing labor conditions in the City of Manchester.  In support of that claim, defendant says:

> The Kaliks breached the contractual obligation under §
> 2.28 [of the Agreement] by making false representations
> concerning staffing and by failing to disclose staffing
> problems.  These false representations and failures to
> disclose were critical to Abacus.  Abacus was led to
> believe the business was growing and that staffing was
> not a problem.  In fact, staffing had historically been
> a problem for the business, especially during its
> busiest time frame.  The Kaliks had an express
> contractual duty to make Abacus aware of those
> problems.  Failing to do so violated both the letter
> and spirit of the Agreement.

Defendant's memorandum at 10.  The court disagrees.

---

Kalik as wages, commissions, benefits, etc.  Moreover,
defendant's apparent decision to obtain what seems to have been
an unnecessary release is not evidence that Kalik even arguably
obligated the Company to pay Holzberg, or that Kalik failed to
disclose a material matter that should have been revealed
pursuant to section 2.20.7 of the Agreement.  In other words,
defendant cannot manufacture a material misstatement of fact - by
buying an unnecessary release - where none truly exists.

17

In support of its claim that Allen Kalik made actionable, materially false statements (or omissions) concerning the local labor market, defendant relies on the affidavits of Rick Clay ("Nor did Allen Kalik disclose that the business had encountered staffing problems during its peak period in the fourth quarter of 1997, even though these problems had occurred only months [prior to the closing]."), Stephen Burke ("Allen Kalik assured Rick Clay that there was a plentiful supply of workers, that there were colleges in the area, and that finding labor was not a problem for [the Company]."), and Barbara Lawler ("[D]uring the five year period that I have worked for the business, the fourth quarter of the year always has been the busiest period for the business based on holiday buying activity. During the five year period that I have worked for the business, staffing has been a problem at various times throughout the year, especially in the fourth quarter.").

So, viewing the evidence in the light most favorable to Abacus, its claim would seem to be that Allen Kalik represented

that, by relying upon local college students and temporary employment agencies, the Company was able to adequately staff its workforce. Defendant says Kalik's representation was both "false" and "material" and claims that, in fact, staffing had been a "problem." Importantly, however, defendant has submitted no affidavits or other evidence suggesting that the Company (or Kalik) was <u>unable</u> to adequately staff its workforce during <u>any</u> time period. It simply claims that finding an adequate number of employees was "difficult" and "problematic" - something it says it never anticipated since it blindly relied on Kalik's allegedly material misstatements to the contrary.

Defendant's counterclaims based on Kalik's alleged misrepresentations concerning the local labor market fail, as a matter of law, for several reasons. First, Abacus suggests that it was misled into purchasing a business it "believed was growing," but which was not (at least according its version of the facts). It is, however, clear from the record that Abacus was provided with ample documentation (and was free to request

19

more) demonstrating exactly the rate at which the business was growing.[3]

This transaction was one between supposedly sophisticated parties, who were represented by able counsel. The closing binder alone contains several hundred pages of documentation memorializing the exact nature and scope of the purchase and sale of the Company and includes, among other things, financial statements for the Company for the years 1995, 1996, 1997, and the five month period ending on May 31, 1998. See Agreement, Schedule 2.8.1. It is somewhat disingenuous of defendant to claim that it was ignorant of the Company's historical revenues, performance, operation, or rate of growth when the purchase and

---

[3] Additionally, the Agreement makes plain that the parties actually contemplated that the Company might not continue to grow in the two years following closing. In the event that earnings did not meet or exceed certain specified levels, Abacus was obligated to pay the Kaliks less than the full $2.4 Million in post-closing payments. See Agreement, section 1.4.1.4 (detailing the post-closing "Earn Out Amount"). Consequently, while Abacus might have "believed [the Company] was growing," the Agreement provided specific protection against the possibility that it was not.

sale was consummated and, in closing the deal, blindly relied on Kalik's statements that generally suggested that things were going well.

Second, taking defendant at its word and assuming that the then-current state of the labor market in greater Manchester was a "critical" factor in its decision to purchase the Company, it could quite easily have obtained publically available information on that subject. See, e.g., Messer v. Smyth, 59 N.H. 41, 42 (1879) ("Whether a false representation made by the vendor . . . is actionable, depends upon whether it relates to a matter concerning which both parties have not equal means of knowledge, and whether it is an expression of opinion or an affirmation of a fact. If it relates to a matter concerning which both the vendor and purchaser have equal means of knowledge, the maxim caveat emptor applies, and the purchaser is without remedy if he neglects to give attention to the means of knowledge accessible to him."). Defendant had equal access to local labor market data, had specific information concerning the Company's employees

21

and labor assets, and certainly could not expect the Kaliks to predict or warrant future labor market conditions.

Alternatively, defendant could have sought to memorialize Kalik's alleged material representations on that subject in the Agreement. See generally Agreement, Article 2 (setting forth over 13 pages of warranties and representations made by the Kaliks to defendant, including such matters as assets owned by the Company, accuracy of financial statements provided to defendants, outstanding tax obligations of the Company, the Company's compliance with local, state, and federal environmental laws, its compliance with ERISA, and its assurance that the financial condition of the Company had not suffered any "materially adverse" changes between the Interim Balance Sheet Date and the date of closing). Defendant did not seek such assurances.

Finally, and perhaps most critically, the alleged statements identified by defendant as having been made by Kalik constitute

22

statements of opinion.  They are not actionable statements of fact.  It has long been the law of New Hampshire that only material misstatements of fact, upon which the complaining party justifiably relied, are actionable.  Statements of opinion, particularly when they relate to matters as to which both parties have equal access to relevant information, are not actionable.

> A representation which merely amounts to a statement of opinion, judgment, probability, or expectation, or is vague and indefinite in its terms, or is merely a loose, conjectural, or exaggerated statement, goes for nothing.  Unless the plaintiffs were willing to accept the statement for what it was worth as a promise, ordinary prudence would seem to require them not to rely upon it, but to call for the facts upon which the opinion or expectation was founded.

Syracuse Knitting Co. v. Blanchard, 69 N.H. 447, 449 (1899) (citation and internal quotation marks omitted).  See also Cummings v. HPG International, Inc., 244 F.3d 16, 21 (1st Cir. 2001) ("There is an important threshold determination for any misrepresentation claim, be it for deceit or for negligent misrepresentation: only statements of fact are actionable; statements of opinion cannot give rise to a deceit action, or to

23

a negligent misrepresentation action.") (citing Massachusetts cases).

In this case, Kalik's alleged representation that staffing was "not a problem" is, at most, so vague a statement of opinion as to render it non-actionable. Critically, it does not amount to a warranty that the Company had always been able to run at full employment. Nor could it reasonably be interpreted as a guarantee that filling <u>future</u> vacant positions could be done without even a modest effort. Instead, it is merely a statement of Kalik's opinion that he had been able to find adequate employees in the local market (occasionally calling upon local college students and temporary employment agencies) to run the business at levels that generated the income and profits that had been represented to defendants.[4]

---

[4] Parenthetically, the court notes that Abacus cannot (reasonably) be claiming that it was unaware of the Company's so-called staffing "problems" prior to closing. Schedule 2.20.8 to the Agreement specifically identifies the six temporary employment agencies upon which the Company periodically relied for additional staffing. That schedule also provides details concerning the dates and terms and conditions under which each of

In light of the foregoing, Allen Kalik's alleged statements (or omissions) concerning the local labor market are not, as a matter of law, actionable as either negligent or intentional misrepresentations, nor do they constitute a breach of his obligations under the Agreement.

II.    The Consumer Protection Act Claim.

Having concluded that the Kaliks are entitled to judgment as a matter of law on defendant's breach of contract, negligent misrepresentation, and intentional misrepresentation claims, the court concludes that they are also necessarily entitled to summary judgment on defendant's Consumer Protection Act claim, which is based upon the very same conduct that forms the basis of the tort and contract claims.

---

those agencies provided employees to the Company.  Consequently, Abacus was certainly aware that, during peak seasonal periods, the Company turned to outside sources, including temporary employment agencies and local colleges, to adequately staff its offices.

New Hampshire's Consumer Protection Act prohibits the use of "any unfair or deceptive act or practice in the conduct of any trade or commerce," and provides a non-exhaustive list of prohibited practices.  RSA 358-A:2.  Even assuming the Act applies to the purchase and sale of the Company, see generally Milford Lumber Co. v. RCB Realty, Inc., __ N.H. __, 2001 WL 1141414 (Sept. 28, 2001), none of the conduct in which the Kaliks are alleged to have engaged falls within the Act's scope.  As the Court of Appeals for the First Circuit has observed, conduct is "unfair" within the meaning of the Act if:

> (1) it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness, (2) it is immoral, unethical, oppressive, or unscrupulous, or (3) it causes substantial injury to consumers.

Chroniak v. Golden Inv. Corp., 983 F.2d 1140, 1146 (1st Cir. 1993) (citations and internal quotation marks omitted).  Because, as a matter of law, the Kaliks neither breached the terms of the contract nor did they make negligent or intentional misrepresentations (or omissions) of material fact, they cannot

26

be said to have engaged in actionable "unfair" or "deceptive" trade practices. Consequently, defendant's claims under the Consumer Protection Act necessarily fail as well.

## Conclusion

For the foregoing reasons, plaintiffs are entitled to judgment as a matter of law as to the following counterclaims advanced by defendant: count 1 (breach of contract); count 2 (intentional misrepresentations); count 3 (negligent misrepresentations); and count 5 (violation of New Hampshire's Consumer Protection Act). Plaintiffs' motion for summary judgment (document no. 28) is, therefore, granted.

The parties shall notify the court once they have completed arbitration and, if appropriate, the court will lift the stay and set a scheduling conference.

27

**SO ORDERED.**

                              _____
                              Steven J. McAuliffe
                              United States District Judge

October 19, 2001

cc:  Steven E. Grill, Esq.
     William S. Hewitt, Jr., Esq.
     John C. Kissinger, Esq.