PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE

v.

WESTINGHOUSE ELECTRIC CORPORATION.

Civ. No. 86–481–D.

United States District Court, D. New Hampshire.

May 11, 1988.

Theodore Wadleigh, Manchester, N.H., for plaintiff.

Robert J. Lynn, Concord, N.H., for defendant.

## ORDER

DEVINE, Chief Judge.

In this diversity action,[1] plaintiff Public Service Company of New Hampshire ("PSNH"), a public utility company, seeks damages of $3 million from defendant Westinghouse Electric Corporation ("Westinghouse") in connection with Westinghouse's sale to PSNH of a steam turbine electric generator which subsequently malfunctioned. In a six-count amended complaint, PSNH alleges breach of express and implied warranties, strict liability, negligence, and fraud.

At bar are PSNH's motion to amend Count VI, Rule 15(a), Fed.R.Civ.P., Westinghouse's motion for summary judgment, Rule 56(b), and the parties' respective objections. Pleadings, memoranda, affidavits, and exhibits have been filed with the Court, and the issues raised by this litigation are clear; accordingly, the Court resolves said motions on the documents as filed. *See* Rule 11(g), Rules of the United States District Court for the District of New Hampshire.

### Background

On March 1, 1971, PSNH purchased a 400–megawatt steam turbine generator[2]

---

1. Jurisdiction is based on the diversity statute, 28 U.S.C. § 1332, the parties being diverse and the amount in controversy exceeding $10,000 exclusive of interest and costs, and on the removal statute, 28 U.S.C. § 1441(a), the action having been removed to this court from the Hillsborough County (New Hampshire) Superior Court on November 13, 1986.

2. A megawatt is one million watts, or one thousand kilowatts. The purpose of a steam turbine generator and the manner in which it operates is described in *Ebasco Serv., Inc. v. Pennsylvania Power & Light Co.,* 460 F.Supp. 163, 172–73 & nn. 5–6 (E.D.Pa.1978), as follows:

> A steam turbine generator is at the heart of any power plant. The turbine obtains steam, under pressures up to super-critical pressure of 3500 lbs per square inch, from either a coal- or oil-fired boiler or a nuclear steam supply system. The steam causes the turbine rotor and its blades (or "buckets") to rotate at very high speeds, often 3600 revolutions per

from Westinghouse for approximately $8 million. The generator, known as Unit # 1, was subsequently installed at PSNH's Newington, New Hampshire, power station and began operating in 1974.

In May 1974, after extended negotiations in response to several failures in the turbine's L-1 stage blades, the parties agreed to a revision of the warranty provisions of the purchase contract. Under the revised warranty, Westinghouse was obligated to retrofit new L-1 blades without charge and extend the warranty on the new blades for one year following retrofit and start-up. *See* Affidavit of Janice A. Fall, Westinghouse paralegal, Exhibit C (copy of warranty provisions and accompanying letter of May 31, 1974, from Westinghouse to PSNH). Westinghouse executed the retrofit on Unit # 1's low pressure ("LP") turbine between June 19 and September 26, 1975.

On May 27, 1975, effective that date, the parties also entered into an automatically renewable annual service contract under which Westinghouse agreed to perform inspection, maintenance, and repair work on PSNH's generating equipment, including Unit # 1. *See* Affidavit of Stan Dembkoski, former District Manager of Westinghouse's Framingham, Massachusetts, Power Generation Service Division, at 1 & Exhibit 1 § 1(a)(4) & *passim* (photocopy of contract). Under the service contract, costs of replacement parts for the turbine generator unit and its auxillaries were to be borne by PSNH and billed at actual cost plus 25 percent. *Id.*, Exhibit 1 at §§ 1(b)(2), 3(a)(7).

In 1976 Westinghouse discovered three cracked blade lugs in the LP turbine and replaced an entire group of six blades. In 1979 Westinghouse discovered two cracked blade roots. After replacing the failed blade roots, Westinghouse submitted them for metallurgical testing. Although Westinghouse issued a 1979 inspection report, it did not report the results of the metallur-

gical testing of the two failed blade roots to PSNH until January 1986.

In 1982 Westinghouse inspected Unit # 1's high pressure turbine and, at the same time, recommended that the LP turbine be disassembled for inspection. PSNH elected to forego the LP turbine inspection, allegedly because Westinghouse implicitly represented that there was nothing to be concerned about relative to the blade roots at the L-1 stage of the turbine. *See* Proposed Amended Count VI ¶¶ 9-12. On September 21, 1982, an L-1 blade in Unit # 1's LP turbine failed, necessitating a shut-down of Unit # 1 until December 10, 1982. During the ten-week shut-down period, PSNH allegedly incurred significant expense from having to rebuild the turbine and from losing of revenue while it was inoperable.

*Discussion*

Westinghouse seeks summary judgment on all counts. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The burden is upon the moving party to establish the lack of a genuine, material, factual issue, *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 15 (1st Cir.1986), and the court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence, *Knight v. Mills*, 836 F.2d 659, 664 (1st Cir.1987); *Ismert & Assoc. v. New England Mut. Life Ins. Co.*, 801 F.2d 536, 537 (1st Cir.1986).

In resolving the issues raised by this motion, the Court considers the counts of the complaint seriatim.

*Count I*

Count I relates to the purchase contract and is brought pursuant to New Hampshire's enactment of the Uniform

minute. The energy thus created is transferred to the generator, which converts this energy to electricity. This electricity is passed,

first through a transformer and then through transmission lines, to the electrical user.

Commercial Code ("UCC"), New Hampshire Revised Statutes Annotated ("RSA") 382–A (1961 & Supp.1987). Count I alleges that because the Unit #1 turbine was defective in design, material, and workmanship, Westinghouse breached RSA 382–A:2–313 (1961), which pertains to "express warranties by affirmation, promise, description, sample." Westinghouse argues that Count I is barred by the UCC statute of limitations and by limitation of warranty provisions explicitly set forth in the contract.

RSA 382–A:2–725 (1961) sets a four-year statute of limitations for breach of contract and breach of warranty actions:

(1) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued....

(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except ... where a warranty explicitly extends to future performance of the goods....

Tender of delivery of Unit #1 occurred in 1975. The revised warranty agreed to by the parties in connection with the retrofit of new L–1 blades extended warranty coverage for one year following retrofit and start-up. *See* Fall Aff., Exhibit C. Westinghouse executed the retrofit on the Unit #1 low pressure ("LP") turbine between June 19 and September 26, 1975; therefore, the warranty negotiated by the parties expired on or about September 26, 1976.

The instant lawsuit was commenced in state court by writ of summons dated September 19, 1986. Petition for Removal ¶ 1. Whether measured from the date of tender of delivery or from expiration of the revised warranty—a distinction the Court need not address at this juncture—the instant action was clearly filed subsequent to the expiration of the four-year statute of limitations. PSNH concedes that it has no evidence to offer that the warranty explicitly extends to future performance. Objection of PSNH to Motion for Summary Judgment [hereinafter "PSNH Objection"] at 12. The inescapable result is that Count I must be barred for its failure to be filed within the statute of limitations period. *See, e.g., Wentworth v. Kawasaki, Inc.,* 508 F.Supp. 1114, 1116 (D.N.H.1981); *Raymond v. Eli Lilly & Co.,* 412 F.Supp. 1392, 1403 (D.N.H.1976), *aff'd,* 556 F.2d 628 (1st Cir.1977).

Because the statute of limitations is an absolute bar to Count I, the Court need not address whether Count I is barred by contractual limitation of warranty provisions.

### Count II

Count II is also brought pursuant to the UCC, RSA 382–A:2–314 (1961). It alleges breach of implied warranties: that due to the defective design, construction, and manufacture of the L–1 stage rotor blades, the LP turbine was not merchantable, was unfit for the ordinary purposes for which such turbines are used, and was unfit for the particular purpose for which it was sold.

Actions for breach of implied warranties are also subject to the UCC four-year statute of limitations, as the UCC does not differentiate between implied and express warranties for the purpose of limiting the period in which actions may be brought. *See* RSA 382–A:2–725(2). Accordingly, the Court's discussion of the viability of Count II may be short-circuited by referring to the discussion above regarding Count I. For the same reasons, Count II is barred.

### Count III

Count III is brought under a theory of strict liability. PSNH alleges that because Unit #1 was defectively designed, constructed, and manufactured, it was unreasonably dangerous to users or consumers of the product, and Westinghouse is therefore liable for property loss occasioned by the unit's malfunction "regardless of whether the ultimate impact of any hazard is on people, other property, or upon the product itself." PSNH Objection at 18 (citing *Pennsylvania Glass Sand v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1172–73 (3d Cir.1981)). The Court disagrees. The circumstances herein are such

that PSNH does not have a viable claim under a theory of strict liability.

The determinative issue in Count III is whether a manufacturer may be held strictly liable for selling a defective product in a commercial transaction if, in malfunctioning, the product damages only itself and causes only economic loss. This issue was previously addressed by Judge Loughlin of this court in *Limbach Co. v. Owens-Corning Fiberglass Corp.*, Civil No. 83-759-L (D.N.H. Jan. 28, 1987) (Order on Motion to Dismiss and for Summary Judgment) [available on WESTLAW, 1987 WL 46869], in which two oil storage tanks developed leaks within two years of installation but caused no harm to other property or persons. Based in part on *Buttrick v. Lessard*, 110 N.H. 36, 260 A.2d 111 (1969), the case in which the New Hampshire Supreme Court recognized the doctrine of strict liability, Judge Loughlin held that the plaintiff had stated a viable strict liability claim for property damages to the tanks themselves. *Limbach Co., supra*, slip. op. at 12–13. Now, however, in light of prescient language in *Buttrick*, New Hampshire Supreme Court post-*Buttrick* decisions, and a recent United States Supreme Court decision, this Court reconsiders the *Limbach* pronouncement and holds as a matter of law that recovery may not be had under a theory of strict liability if a product failure damages only the product itself.

In *Buttrick*, although the New Hampshire Supreme Court allowed the plaintiff to proceed on theories of express and implied warranty *as well as* strict liability, the court prefaced its holding by stating:

The question of when a plaintiff should be permitted to recover under the law of warranty or under strict liability and whether strict liability has superceded the warranty approach has been argued by legal scholars with all the zeal, fury and abstruseness of medieval theologians.

It is apparent that before the fine problems raised by the scholars have settled into clear rules as to when the approach is warranty and when strict liabil-

ity many cases will have to settle into the books.

*Buttrick, supra*, 110 N.H. at 38, 260 A.2d at 112–13 (citations omitted). In the nearly twenty years which have elapsed since *Buttrick* was decided, future cases anticipated by that opinion have materialized, clarifying the differences between the theories of recovery and the situations in which they are applicable.

Since *Buttrick* the New Hampshire Supreme Court has declared that the doctrine of strict liability is to be applied reluctantly and limited to cases in which the New Hampshire Legislature has provided for it or in which the common law has imposed such liability and the Legislature had not seen fit to disagree. *See, e.g., Bagley v. Controlled Environment Corp.*, 127 N.H. 556, 558–59, 503 A.2d 823, 825 (1986). Applying the doctrine in this restrictive fashion, that court has declined to impose strict liability in numerous circumstances. *See, e.g., Bagley, supra*, 127 N.H. at 560, 503 A.2d at 826; *Siciliano v. Capitol City Shows, Inc.*, 124 N.H. 719, 730, 475 A.2d 19, 25 (1984); *Wood v. PSNH*, 114 N.H. 182, 188–89, 317 A.2d 576, 579–80 (1974).

Moreover, in *Buttrick* and in all post-*Buttrick* cases in which courts applying New Hampshire law have allowed a plaintiff to assert both strict liability *and* warranty claims based on the same cause of action (i.e., the combination which PSNH herein urges upon the Court), the product defect at issue resulted in personal injury as well as property damage. *See, e.g., Sheehan v. New Hampshire Liquor Comm'n*, 126 N.H. 473, 493 A.2d 494 (1985) (exploding bottle of wine); *Buttrick, supra*, 110 N.H. 36, 260 A.2d 111 (automobile accident); *Brochu v. Ortho Pharm. Corp.*, 642 F.2d 652, 654 (1st Cir.1981) (oral contraceptive); *Raymond v. Eli Lilly & Co., supra*, 412 F.Supp. at 1403 (oral contraceptive). In *Waid v. Ford Motor Co.*, 125 N.H. 640, 484 A.2d 1152 (1984), the court interpreted *Buttrick* as offering relief only "to those plaintiffs *injured* by an unreasonably dangerous, defective product *who could not show that a warranty or a duty of care had been breached.*" *Id.*, 125 N.H. at 644, 484 A.2d at 1155 (emphasis added).

**1286**

In *Bagley, supra,* 127 N.H. at 560, the Court required a finding that a plaintiff be unable to establish a breach of duty. In contrast, in the instant action there is neither personal injury nor an inability (except of plaintiff's own making vis-à-vis the UCC statute of limitations) to show that a warranty was breached.

Furthermore, in a case similar to the instant one, the United States Supreme Court recently addressed the issue of whether a manufacturer may be held strictly liable for selling a defective product which, in malfunctioning, damages only itself, and held that no claim was stated under theories of strict liability *or* negligence. *See East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

The Supreme Court analyzed the three most prevalent approaches used by courts, commentators, and Congress in addressing whether injury to a product itself may be actionable in tort, *id.* at 868–69 & nn. 3–4, 106 S.Ct. at 2300–2301 & nn. 3–4, and held that in determining whether to cast liability in warranty or tort, distinctions turning on the degree of risk or the manner in which damage occurs are not appropriate. The court stated:

> Even when the harm to the product itself occurs through an abrupt, accident-like event, the resulting loss due to repair costs, decreased value, and lost profits is essentially the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of contract law.

*Id.* at 870, 106 S.Ct. at 2302 (citing E. Farnsworth, *Contracts* § 12.8, at 839–40 (1982)). The court found that warranty law "sufficiently protects the purchaser by allowing it to obtain the benefit of its bargain," *id.* at 873, 106 S.Ct. at 2303, and protects the manufacturer through built-in limitations on liability, which, if not allowed, would result in increased costs to consumers, *id.* at 872–74, 106 S.Ct. at 2302–04. The court stated that because "[d]amage to a product itself is most naturally understood as a warranty claim," and "because maintenance of product value and quality is precisely the purpose of express and implied warranties," contract law, particularly the law of warranty, is the most appropriate theory of liability to apply in a controversy involving a defective product which has caused damage only to itself.[3] *Id.* at 872, 106 S.Ct. at 2302–03. The court also noted that although turbines are composed of many component parts, each turbine is properly regarded as a single unit. Thus, if in breaking down one part damages only another part within the turbine, the breakdown may not be regarded as damaging other property—the touchstone of traditional property damage cases. The court concluded: "[W]e adopt an approach similar to *Seely* [*v. White Motor Co.,* 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965)], and hold that a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* 476 U.S. at 871, 106 S.Ct. at 2302.[4]

In light of the above-discussed cases, this Court is of the view that the New Hampshire Supreme Court would, if faced with the issue, deny tort liability for purely economic loss. *See Aloe Coal Co. v. Clark Equip. Co.,* 816 F.2d 110, 119 (3d Cir.) (effectively overruling *Pennsylvania Glass Sand, supra,* 652 F.2d 1165, and holding that in light of *East River* Pennsylvania Supreme Court would overturn state precedent and "reaffirm [its] lack of hospitality to tort liability for purely economic loss"), *cert. denied,* —— U.S. ——, 108 S.Ct. 156,

---

3. "Or," the Court stated, "if the customer prefers, it can reject the product or revoke its acceptance and sue for breach of contract." *East River, supra,* 476 U.S. at 872, 106 S.Ct. at 2303. Such did not occur in the instant case.

4. PSNH contends that *East River* is inapposite because it is based on admiralty law. PSNH Objection at 20–21. The Court finds otherwise. Although jurisdiction in *East River* was based on admiralty, and the Supreme Court applied general admiralty law, it noted that maritime law "is an amalgam of traditional common-law rules" and that in facing the issue at hand the court would apply general products liability concepts, "long a part of the common law of torts," and incorporate those principles into the body of maritime law. *East River, supra,* 476 U.S. at 864–65, 106 S.Ct. at 2298–99.

98 L.Ed.2d 111 (1987); *Richard O'Brien Companies v. Challenge–Cook Bros., Inc.,* 672 F.Supp. 466, 472–73 (D.Colo.1987) (anticipating in light of *East River* and other case law that Colorado Supreme Court would overrule precedent to preclude tort claims for purely economic loss); *cf.* W. Keeton, D. Dobbs, R. Keeton & D. Owen, *Prosser and Keeton on The Law of Torts* § 106, at 655–58 (1984) [hereinafter *"Prosser"*]. Inasmuch as the malfunction caused by the defective blade roots at issue here damaged only the Unit # 1 turbine, and no personal injury or other property damage was sustained, the Court herewith finds and rules that recovery under a theory of strict liability is unavailable to PSNH. Westinghouse is granted summary judgment in its favor as to Count III.

*Count IV*

■ Count IV alleges that Westinghouse's defective design, construction, and manufacture of Unit # 1's turbine is actionable under a theory of negligence.

As set forth above, the damage at issue involves only the turbine itself. Because Westinghouse owed no duty to PSNH based on negligence principles to avoid causing purely economic loss through purchase and subsequent malfunctioning of its product, PSNH has no cause of action in negligence. *See East River,* 476 U.S. at 875–76, 106 S.Ct. at 2304–05; *see also, e.g., Shipco 2295, Inc. v. Avondale Shipyards, Inc.,* 825 F.2d 925, 926–30 (5th Cir.1987), *cert. denied,* ── U.S. ──, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988); *Richard O'Brien Companies, supra,* 672 F.Supp. at 471–72; *Prosser* § 92, at 655–58; *cf. Comind, Companhia de Seguros v. Sikorsky Aircraft Div. of United Technologies Corp.,* 116 F.R.D. 397, 416–17 (D.Conn.1987) (tort claims not barred because personal injury involved).[5] Westinghouse is herewith

granted summary judgment in its favor as to Count IV.

*Count V*

Count V relates to the service contract. PSNH contends that it is entitled to $3 million in damages based on Westinghouse's negligence in failing to properly perform its 1979 and 1982 inspections of Unit # 1, failing to report the results of the 1979 metallurgical testing of the failed blade roots to PSNH, and failing to disclose to PSNH breakdowns of similar turbines owned by other Westinghouse customers. In opposition, Westinghouse contends that Count V is barred by express terms of the service contract.

Although Westinghouse is correct in noting that the service contract includes language purporting to preclude actions brought in negligence, the gravamen of the harm alleged in Count V is that PSNH did not get the benefit of its bargain because Westinghouse failed to comply with the terms of the contract. As damages, PSNH seeks the cost of remedying the defects in Westinghouse's performance; that is, PSNH seeks to be placed in the same position it would have been in had Westinghouse properly performed the contract. Therefore, Count V is properly viewed as an action in contract, not tort, and contractual language precluding negligence actions is not germane. *See Roberts v. Richard and Sons, Inc.,* 113 N.H. 154, 156, 304 A.2d 364, 366 (1973) (and citations therein) (characterization of action as contract or tort controlled by substance of action, not form in which action is cast).

■ It is clear that there are genuine issues of material fact as to whether Westinghouse properly performed under the service contract, if evidenced by nothing more than the self-destruction of the Unit # 1 turbine while the service contract was in effect. It is also clear that Count V was timely brought.[6] Therefore, summary

---

5. Westinghouse also argues that Section D of the purchase contract's warranty provisions bars PSNH's negligence claims by limiting Westinghouse's liability to correction of nonconformities. In light of the discussion above dismissing PSNH's negligence claim, this argument is moot.

6. Article 2 of the UCC applies to transactions in goods, not services, *see* RSA 382–A:2–102 (1961); therefore, the UCC four-year statute of limitations which bars Counts I and II is not applicable to Count V. Instead, general New Hampshire statutory provisions regarding the limitation of actions apply: herein, six years. *See* RSA 508:4 (1983 & Supp.1987) (amended effec-

judgment totally precluding Count V is inappropriate. However, summary judgment regarding the limit of Westinghouse's liability is appropriate.

■ Although three clauses in the service contract purport to limit Westinghouse's liability, PSNH alleges that such a disparity existed between the parties' bargaining positions at the time the contract was negotiated that the contractual terms were "forced" on PSNH, and the Court should accordingly find the limiting terms to be unconscionable. In a commercial setting, "courts dealing with unconscionability claims have espoused the principle that the parties ought to be left free to make their own agreements in the absence of fraud or overreaching." *Hydraform Prod. Corp. v. American Steel & Alum. Corp.*, 127 N.H. 187, 195, 498 A.2d 339, 373 (1985). "The principle is one of the prevention of oppression and unfair surprise ... and not of disturbance of allocation of risks because of superior bargaining power." *Id.*, 127 N.H. at 194, 498 A.2d at 343. The burden of proof is upon the buyer to show that there is an issue of fact as to unconscionability. *Xerox Corp. v. Hawkes*, 124 N.H. 610, 618, 475 A.2d 7, 10 (1984).

To support its position, PSNH has provided the affidavit of Warren A. Harvey, PSNH's Vice–President of Production. Mr. Harvey asserts that because Westinghouse and General Electric ("GE") were the only companies which could realistically bid on the project, they "effectively controlled access to this limited market," and were able to "insist that their standard form contracts be made part and parcel of any agreement to work with PSNH in constructing and placing into service power-generating equipment." Harvey Aff. ¶¶ 5, 8. Even accepting at face value Mr. Harvey's assertion that Westinghouse and GE enjoy a duopolistic position in the market-

place,[7] Mr. Harvey admits that PSNH voluntarily chose to do business with Westinghouse, rather than GE, *without* negotiating with GE or other companies and that the decision to go with Westinghouse was largely based on the parties' ongoing and satisfactory business relationship. *Id.* ¶¶ 6–7.

The doctrine of unconscionability is of questionable applicability if the transaction involves a significant sum of money because the buyer retains "impressive negotiation power." *County Asphalt, Inc. v. Lewis Welding & Eng'g Corp.*, 323 F.Supp. 1300, 1308 (S.D.N.Y.1970), *aff'd*, 444 F.2d 372 (2d. Cir.), *cert. denied*, 404 U.S. 939, 92 S.Ct. 272, 30 L.Ed.2d 252 (1971). Herein, the purchase price of the Unit # 1 turbine was nearly $8 million. And, even accepting as true that PSNH could not avoid the limitation of liability clauses herein at issue because Westinghouse and GE used standard contractual terms, *see* Harvey Aff. ¶ 8, the use of contract language on an industry-wide basis is acceptable in New Hampshire, *see Mills v. Nashua Fed. Sav. & Loan Ass'n*, 121 N.H. 722, 725–26, 433 A.2d 1312, 1314–15 (1981). Finally, a finding of unconscionability is foreclosed in light of the fact that PSNH was no novice in either the power industry or the business world in general when it undertook to purchase Unit # 1. Both parties are sizable business entities, and the agreement between them was carefully arrived at after months of negotiations and numerous communications. *See American Elec. Power Co. v. Westinghouse*, 418 F.Supp. 435, 458 (S.D.N.Y.1976) (purchase by public utility of 760–megawatt steam turbine electric generator from Westinghouse; contractual limitations of warranty not unconscionable because "painstakingly negotiated between industrial giants"); *Ebasco Serv., Inc. v. Pennsylvania Power & Light Co., supra* note 2, 460 F.Supp. at 222 (same phrase

---

tive July 1, 1986); *Roberts, supra*, 113 N.H. at 157, 304 A.2d at 366. Count V was timely brought.

7. Westinghouse refutes this contention, claiming that PSNH has failed to account "for such well-known suppliers as Brown–Boveri, Siemens, English Electric and other international

companies which compete in the domestic market." Defendant's Reply Memorandum at 3–4. The presence of competitors with whom the weaker party may deal militates against a finding that terms are unconscionable. *See, e.g., Hydraform Prod. Corp., supra*, 127 N.H. at 195, 498 A.2d at 344.

quoted from *American Elec. Power Co.* in purchase by public utility of steam turbine generator from GE); *Hydraform Prod. Corp., supra,* 127 N.H. at 195, 498 A.2d at 343–44 (parties' relative bargaining power must be "so disparate that the weaker party is left without any genuine choice" or one party must be "vastly more experienced than the other"); *K & C, Inc. v. Westinghouse Elec. Corp.,* 437 Pa. 303, 263 A.2d 390, 393 (1970) (unconscionability denied as to exclusion of consequential or special damages because loss was commercial and contracting parties included experienced attorneys: "buyer was hardly the sheep keeping company with wolves that it would have us believe").

In summary, the Court finds that the service contract's limitations of warranty are not unconscionable. Therefore, at issue is which of the limiting clauses controls.

■ As stated previously, three clauses are at issue. The first, found in the section of the service contract entitled "Limitation of Liability", precludes Westinghouse's liability for "special, indirect, incidental, or consequential damages." *See* Dembkoski Aff., Exhibit 1 (service contract) (*see particularly* "Field Repair and/or Maintenance Services, Selling Policy 1710", at 1–2). The Court finds that this clause is valid because it is uncontradicted; moreover, such a limitation is not unusual in the power industry. *See American Elec. Power Co., supra,* 418 F.Supp. at 458–60 (upholding virtually identical clause); *Ebasco Serv., Inc., supra* note 2, 460 F.Supp. at 222 (precluding recovery for cost of replacement power).

However, the other two clauses at issue contradict each other and thus create an ambiguity as to the parties' intent. One clause states that PSNH may recover the cost of having the turbine replaced or repaired; the other limits PSNH to recovery

of what it paid for the service contract.[8] Dembkoski Aff., Exhibit 1 (service contract). It is the Court's function, "with or without the assistance of the jury, [to] resolve those ambiguities" to ascertain the intent of the parties. *MacLeod v. Chalet Susse Int'l, Inc.,* 119 N.H. 238, 243, 401 A.2d 205, 209 (1979). In this determination, "[t]he intention ... is to be gathered, not from [a] single sentence ..., but from the whole instrument read in the light of the circumstances existing at the time of negotiations leading up to its execution." *RCI Northeast Serv. Div. v. Boston Edison,* 822 F.2d 199, 203 (1st Cir.1987) (quoting *Miller v. Robertson,* 266 U.S. 243, 251, 45 S.Ct. 73, 76, 69 L.Ed. 265 (1924)). The contract is to be construed to "accord it a reasonable and sensible meaning, consonant with its dominant purpose." *Id.* (quoting *Continental Bus System, Inc. v. NLRB,* 325 F.2d 267, 273 (10th Cir.1963)).

■ New Hampshire law contemplates that "relevant extrinsic evidence concerning [the parties'] intent should not be excluded," and that it is the jury's function "to determine the 'credibility of' and the 'reasonable inferences to be drawn from extrinsic evidence.'" *MacLeod, supra,* 119 N.H. at 243–44, 401 A.2d at 209 (and citations therein). Accordingly, the Court finds that summary judgment on the issue of which of the limiting clauses controls is not appropriate.[9] *See, e.g., Singer Co. v. E.I. du Pont de Nemours & Co.,* 579 F.2d 433, 439–40 (8th Cir.1978) (and citations therein). That issue and the issue of whether Westinghouse properly performed its obligations according to the terms of the service contract must go to the trier of fact.

## Count VI

Count VI alleges that Westinghouse's failure to report the results of the metallur-

---

8. Further confusion as to the parties' intent is engendered by the service contract's specification that PSNH was to pay for replacement parts. *See supra* at 1283.

9. Based on the Court's previous finding that PSNH was not in a vastly disparate bargaining position, this is not an appropriate case in

which to apply the principle that ambiguous contractual language is to be construed against the author. *See, e.g., RCI Northeast Serv. Div. v. Boston Edison Co.,* 637 F.Supp. 1178, 1179 (D.Mass.1986) (and citations therein), *aff'd,* 822 F.2d 199 (1st Cir.1987).

gical testing of the failed blade roots and its failure to disclose known information of Westinghouse turbine blade failures in other power plants constitutes common law fraud. Westinghouse moves for summary judgment on two grounds. First, it avers that the allegations of fraud are not stated with sufficient particularity to satisfy Rule 9(b), Fed.R.Civ.P. Second, in further argument and in answer to PSNH's motion for leave to amend Count VI pursuant to Rule 15(a), Fed.R.Civ.P., Westinghouse contends that, even in an amended form, Count VI does not state a cause of action under New Hampshire law.

■ The decision to grant or deny a Rule 15(a) motion to amend lies within the sound discretion of the district court, *Tiernan v. Blyth, Eastman, Dillon & Co.*, 719 F.2d 1, 4 (1st Cir.1983), and leave to amend is "freely given when justice so requires," Rule 15(a), Fed.R.Civ.P.; *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). In the instant case, Westinghouse anticipated PSNH's motion for leave to amend in its motion for summary judgment, so PSNH's move to amend may not be said to come as a surprise to Westinghouse. Additionally, trial has not been scheduled, and discovery deadlines have been extended to allow for the instant motion. Accordingly, Westinghouse's ability to secure additional discovery will not be prejudiced by allowance of the motion. The Court therefore exercises its discretion and herewith grants PSNH's motion to amend Count VI. Having done so, the Court considers Westinghouse's motion for summary judgment as it applies to the amended count.

PSNH alleges that had it been informed that Westinghouse had experienced blade root problems in other similar turbines, it would have ordered Unit #1 to be disassembled and repaired during the July 1982 inspection, before the breakdown and resultant damage occurred. PSNH contends that Westinghouse's failure to warn constitutes misrepresentation by omission; i.e., fraud.

Here, Westinghouse's obligation does not arise out of any common law tort duty, even assuming that such exists. *But see Benoit v. Perkins*, 79 N.H. 11, 15, 104 A.

254 (1918) (absent legal obligation to disclose omitted information, claim of fraud based on nondisclosure may not be sustained); *Prosser* § 106, at 737. If Westinghouse had any duty to warn PSNH, such duty arose by the terms of the service contract. A clause in the service contract in the section entitled "Warranty" states:

> With respect to any nondestructive examination services performed hereunder, Westinghouse warrants that the services of its personnel or contractors will reflect their best professional knowledge and judgement.

*See* Dembkoski Aff., Exhibit 1 (service contract) ("Field Repair and/or Maintenance Services, Selling Policy 1710", at 1). The gravamen of the harm alleged in Count VI is that PSNH did not get the benefit of its contractual bargain because, by withholding necessary information, Westinghouse service personnel failed to exercise reasonable professional knowledge and judgment, breaching the contractual term set forth above. Therefore, Count V is properly viewed as an action in contract, not tort. *See Roberts v. Richard & Sons, Inc., supra*, 113 N.H. at 156, 304 A.2d at 366. Allowing the claim to be brought under a theory of intentional tort (herein, fraud) would effectively bypass the entire body of contract law, and sound jurisprudential policy demands otherwise. As one commentator has stated:

> The distinction between tort and contract liability, as between parties to a contract, has become an increasingly difficult distinction to make. It would not be possible to reconcile the results of all cases. The availability of both kinds of liability for precisely the same kind of harm has brought about confusion and unnecessary complexity. It is to be hoped that eventually the availability of both theories—tort and contract—for the same kind of loss with different requirements both for the claimant's *prima facie* case and the defendant's affirmative defenses will be reduced in order to simplify the law and reduce the costs of litigation.

*Prosser* § 92 at 655.

■ The Court herewith finds that Count VI is improperly cast, but may be

viable if viewed as a breach of contract claim. Whether Westinghouse failed to provide PSNH personnel with pertinent information and, if so, whether such failure breached the above-cited or other contractual terms are, however, issues of fact which are not susceptible of resolution on summary judgment.

### Conclusion

Summary judgment is granted in favor of defendant Westinghouse on all counts relating to the purchase contract: Counts I and II for PSNH's failure to comply with the applicable UCC statute of limitations; Counts III and IV because PSNH's claims must be brought in contract, not tort.

Summary judgment is granted in part and denied in part as to Counts V and VI, which relate to the service contract. As set forth above, summary judgment is granted insofar as barring all claims brought under theories of liability other than contract and all claims for consequential damages, but is denied as to certain issues of fact which must be determined by the trier of fact.

SO ORDERED.