THE COLONIAL LIFE INSURANCE COMPANY OF AMERICA, Chubb Life Insurance Company of America, and the Volunteer State Life Insurance Company d/b/a Chubb Life America, Plaintiffs,

v.

ELECTRONIC DATA SYSTEMS CORPORATION, Defendant.

Civ. A. No. 90–420–M.

United States District Court, D. New Hampshire.

March 31, 1993.

William L. Chapman, Concord, NH, James J. Marcellino, Boston, MA, Donna M. Sherry, Wellesley, MA, for plaintiffs.

Charles W. Grau, Concord, NH, Ayala T. Alexopoulos, Plano, TX, Phillip N. Smith, Dallas, TX, for defendant.

## ORDER ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

McAULIFFE, District Judge. ·

Before the Court for consideration is defendant's, Electronic Data Systems Corporation's ("EDS"), Motion for Partial Summary Judgment (document no. 51), to which Chubb Life America [1] ("Chubb"), objects (document no. 54). EDS seeks summary judgment in this breach of contract action on issues related to limitations on damages, limitation of express warranties, breach of contract claims, and alternative dispute resolution.

### Relevant Facts

On July 10, 1987, EDS and Chubb entered into an agreement for the License of Computer Software ("the Agreement"). EDS agreed to license computer software to Chubb and provide data processing services as specified in the agreement. In exchange, Chubb agreed to pay EDS $21,300,450.00, and to perform certain obligations in connection with implementation of the EDS pro-

---

1. Plaintiffs, The Colonial Life Insurance Company of America, Life Insurance Company of America and the Volunteer State Life Insurance Company, all life insurance underwriters, are separate corporations doing business as a group under the same management under the trade name Chubb Life America.

2. In its complaint, Chubb requests damages in the amount of twenty million dollars on each of its counts of misrepresentation, negligent misrepresentation, breach of contract and breach of

cessing system called the "Insurance Machine."

The Agreement between EDS and Chubb contains certain provisions which are particularly relevant to the disposition of this motion. First, the agreement contains a limitation of damages clause.[2] Section 11.4 of the Agreement provides as follows:

> *Definition of Liability.* In the event that EDS shall be liable [to Chubb] due to EDS' performance or nonperformance of its obligations under this Agreement, whether arising by negligence, intended conduct, or otherwise (i) the amount of damages recoverable against EDS for all events, acts or omissions shall not exceed in the aggregate the compensation payable in accordance with this Agreement for the two months preceding the event giving rise to said liability, and (ii) the measure of damages shall not include any amounts for indirect, consequential or punitive damages of any party, including third parties, or for damages which could have been avoided had the data furnished by EDS or the EDS System been verified before utilization.

The Agreement also contains a limitation of warranties clause. Section 8.2 of the Agreement provides:

> *Warranty to Conform to Detailed Design Specifications:* EDS warrants that the EDS Systems as installed shall, for a period of one hundred and twenty (120) days substantially conform to the detailed design specifications, (including any specified interaction of components), provided further, [Chubb's] sole and exclusive remedy for any breach of such warranty shall be the correction, by EDS, of any such defect in the EDS Systems. Said warranty period shall begin with the acceptance of any

---

warranties. Additionally, Chubb alleges that the total damages it has suffered are calculated to be anywhere between $35,300,000 and $42,800,000. These damages apparently include (i) actual costs and expenses, including payments made to EDS, totaling approximately $21,000,000 and (ii) the costs of designing a replacement system for the system promised by EDS, estimated at a cost of $15,000,000 to $30,000,000. (Affidavit of Louise M. Firth).

module for all aspects relating solely to the internal operation of that module.

Finally, Section 8.4 of the Agreement contains the following disclaimer of warranty:

EXCEPT AS PROVIDED ABOVE, EDS MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Section 2.1(b) of the Agreement incorporates by reference pages 7–62 of the pre-contract Proposal of April 1987, which contains certain express warranties.

After entering into the Agreement, both EDS and Chubb had difficulty complying with the schedule and performing their respective contractual obligations, resulting in subsequent letter agreements dated September 9, 1988, and January 31, 1989, modifying the July, 1987, Agreement. To date, Chubb has apparently paid EDS over eleven million dollars, but has allegedly not received the software that was to be delivered within the first fifteen months of the project.

*Summary Judgment Standard*

A Motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In ruling upon a party's motion for summary judgment, the Court must "view the entire record in the light most hospitable to the party opposing summary judgment, including all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir. 1990).

The moving party has the burden of demonstrating the absence of a genuine issue of material fact for trial. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505,

2514, 91 L.Ed.2d 202 (1986). If the moving party carries its burden, the party opposing the motion must set forth specific facts showing that there remains a genuine issue for trial, demonstrating "some factual disagreement sufficient to deflect *brevis* disposition." *Mesnick v. General Electric Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). This burden is discharged only if the cited disagreement relates to a genuine issue of material fact. *Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992).

*Discussion*

1. Application of the UCC to the Transaction

The dispute between EDS and Chubb related to limitations on damages and express warranties necessarily requires the Court to first determine, as a matter of law, whether the Uniform Commercial Code, ("the Code"), N.H.REV.STAT.ANN. 382–A:2 (1991), including its damages and warranty provisions, applies to this case. Since the Court is exercising diversity jurisdiction, it must apply New Hampshire law.[3] *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Whether the Code, in particular Article Two of the Code, is applicable to transactions involving computer software, is an issue which has inspired some commentary.[4] In general, "[a] contract for computer data processing services is neither a contract purely for personal services nor a contract for the sale of goods. It is an enterprise that involves a combination of personal skills and labor, materials, equipment and time." *Kearsarge Computer, Inc. v. Acme Staple Co.,* 116 N.H. 705, 710, 366 A.2d 467, 471 (1976).

The test for "inclusion or exclusion from Article 2 is not whether the goods and non-

---

**3.** Also, Section 12.14 provides that the Agreement "shall be governed by and construed in accordance with the laws of New Hampshire."

**4.** *See* Boss & Woodward, *Scope of the Uniform Commercial Code; Survey of Computer Contracting Cases,* 43 Bus.Law. 1513 (1988); Bonna Llyn

Horovitz, Note, *Computer Software as a Good Under the Uniform Commercial Code: Taking the Byte Out of the Intangibility Myth,* 65 B.U.L.Rev. 129 (1985); Rodau, *Computer Software: Does Article 2 of the Uniform Commercial Code Apply,* 35 Emory L.J. 853 (1986).

goods parts of the contract are mixed, but rather, 'whether their predominant ·factor, their thrust, their purpose, reasonably stated . . . is a transaction of sale.' " *Cianbro Corp. v. Curran–Lavoie, Inc.*, 814 F.2d 7, 14 (1st Cir.1987) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974) (contract for sale of goods including substantial amounts of labor covered by Article 2)).

Section 2–202 of the Code provides that it is applicable to any "transaction in goods." N.H.REV.STAT.ANN. 382–A:2–202 (1991). The New Hampshire Supreme Court has noted that "[t]he use of the term 'transaction' rather than 'sale' in UCC § 2–202 makes it clear that Article 2 is not to be confined to those transactions in which there is a 'sale,' that is a transfer of title." *Xerox Corp. v. Hawkes*, 124 N.H. 610, 615, 475 A.2d 7, 9 (1984) (quoting 1 R. Anderson, Uniform Commercial Code, § 2–103:4 at 500–01 (1981)) (warranty and damage provisions of Article 2 held applicable to service agreement between lessor and lessee of copy machine).

Here, EDS and Chubb entered into an agreement for the license of computer software. Section 1.1 of the Agreement describes the transaction as follows:

> EDS shall provide [Chubb] the computer software and DP [data processing] services described herein for delivery and/or use in New Hampshire subject to the terms and conditions set forth in this Agreement. The performance will begin with the installation of the Insurance Machine. . . .

The section continues with a description of the contemplated phases of the agreement, and the projected completion dates for each phase. Under the contract, EDS was to spend four years developing and customizing its Insurance Machine for Chubb. At the end of this term Chubb was to receive a license to use the system. EDS maintains that the UCC should not apply to the contract because it was dominated not by goods, but by the years of service EDS was to provide Chubb. The Court disagrees.

Although the Agreement did contemplate many years of servicing, the purpose or thrust of these services was support of EDS' product, the Insurance Machine, in accommo-

dating Chubb's business practices. The essence of the contract was to license Chubb to use a computer software product. Computer software has been held to fall within the definition of a "good" under the Code. *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 675–76 (3rd Cir.1991); *see also RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543, 546–47 (9th Cir.1985) (goods aspects of transaction predominated in the sale of a software system); *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 742–43 (2d Cir.1979) (same). Additionally, the warranty and damage provisions of the Code have been held to apply to a lease arrangement in New Hampshire. *See Xerox; supra.*

The Court holds that the Uniform Commercial Code, as adopted in New Hampshire, applies to the contract between EDS and Chubb, the principal object of which was to provide for a license to use computer software. *Accord Graphic Sales, Inc. v. Sperry Univac Div. Sperry Corp.*, 824 F.2d 576, 579 (7th Cir.1987) (citing district court opinion which held that Article 2 of the Code applies to leases of computer equipment).

### 2. Limitation of Damages

Defendant EDS contends that the limitation of damages clause, contained in Section 11.4 of the License Agreement, is binding on Chubb's breach of contract, breach of warranty, and negligent misrepresentation claims. Limitations of damages are generally enforced under New Hampshire law. *See Public Service Co. v. Westinghouse Elec. Corp.*, 685 F.Supp. 1281, 1288–1291 (D.N.H.1988); *PK's Landscaping, Inc. v. New England Tel. & Tel. Co.*, 128 N.H. 753, 755, 519 A.2d 285, 286–87 (1986). Relevant portions of the Code are as follows:

> (2) Where circumstances cause an exclusive or limited remedy to *fail of its essential purpose,* remedy may be had as provided in this chapter.

> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is *unconscionable.* Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation where

loss is commercial is not. (emphasis added).

N.H.REV.STAT.ANN. § 382–A:2–719(2), (3) (1991). When, as here, a transaction is between two commercial entities, contractual limitations on consequential and incidental damages[5] are normally enforced. *Xerox Corp. v. Hawkes,* 124 N.H. 610, 617, 475 A.2d 7, 10 (1984) (citing cases). The language in Section 11.4 of the License Agreement limits EDS' liability exposure for its breach to "the compensation payable ... for the two months preceding the event giving rise to said liability." In addition, Section 11.4 specifically excludes incidental and consequential damages.

Chubb argues that consequential damages[6] are automatically available to a grieving buyer under § 2–719(3), if an exclusive or limited remedy fails of its essential purpose under § 2–719(2), notwithstanding an express contractual exclusion of consequential damages. There is a split of authority on the issue of whether § 2–719(2) and (3) are interdependent—permitting the recovery of consequential damages, despite a disclaimer, when a limited remedy fails of its essential purpose, or, independent—allowing an exclusion of consequential damages to survive, even if a limited remedy fails of its essential purpose, provided the limitation of damages

is not unconscionable under § 2–719(3).[7] In analyzing the "friction that can occur between subsections (2) and (3) when a limited or exclusive remedy fails of its essential purpose, White and Summers note that a 'deep division' of opinion exists on whether the subsections are mutually exclusive in such circumstances, but that the better line of cases is the one according independent status to the subsections." *McKernan v. United Technologies Corp.,* 717 F.Supp. 60, 71 (D.Conn.1989) (quoting J. White & R. Summers, *Uniform Commercial Code,* Section 12–10 at 526–27 (3d ed. 1988)). White and Summers reason that " '[t]hose cases seem most true to the Code's general notion that the parties should be free to contract as they please.... Believing the parties to know their own interests best, we would leave the risk allocation to the parties.' " *Id.* (quoting White and Summers, Section 12–10 at 527–28).

The position of the New Hampshire Supreme Court, while not entirely clear, seems to follow the preferred approach of White and Summers. The New Hampshire Supreme Court addressed the interplay between § 2–719(2) and (3) in *Xerox Corp. v. Hawkes,* 124 N.H. 610, 475 A.2d 7 (1984). In *Xerox,* the Court articulated its position as

---

**5.** Consequential damages are defined in 2–715(2) to include:

  (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and
  (b) injury to person or property proximately resulting from any breach of warranty.

N.H.REV.STAT.ANN. § 382–A:2–715(2) (1991). Incidental damages include:

  expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

N.H.REV.STAT.ANN. § 382–A:2–715(1) (1991).

**6.** After presenting a lengthy argument as to the availability of consequential damages, Chubb asserts that it only seeks direct damages, rather than any consequential, incidental or special damages. (Chubb's Opp. p. 35–36) Chubb's characterization of its clear request for incidental and/or consequential damages in its complaint,

as "direct or reliance damages," appears to be merely an attempt to circumvent the exclusion of consequential damages under the Agreement, as well as the unconscionability standard contained in § 2–719(3).

  Chubb's complaint asks for "all reasonably foreseeable damages" resulting from the alleged breach of contract and breach of warranties by EDS. Complaint, at 11 ¶ C, D.

**7.** *Compare Fidelity & Deposit Co. of Maryland v. Krebs Eng'rs,* 859 F.2d 501, 504–05 (7th Cir. 1988) (automatic recovery of consequential damages upon remedy's failure of essential purpose); *R.W. Murray, Co. v. Shatterproof Glass Corp.,* 758 F.2d 266, 272 (8th Cir.1985) (same) *with Canal Elec. Co. v. Westinghouse Elec. Corp.,* 406 Mass. 369, 374, 548 N.E.2d 182, 185 (Mass.1990) (disclaimer of consequential damages is enforceable, even though the limited remedy has failed of its essential purpose); *Riegel Power Corp. v. Voith Hydro,* 888 F.2d 1043, 1047 (4th Cir.1989) (same); *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.,* 866 F.2d 752, 778–80 (5th Cir.), *cert. denied,* 493 U.S. 820, 110 S.Ct. 77, 107 L.Ed.2d 43 (1989) (same).

follows: "Those portions of a contract disallowing incidental and consequential damages are considered separate and distinct from the language dealing with [limitation of remedies to] repair and replacement. Such damage limitations survive even if the contractual provision limiting the buyer's remedies to repair or replacement is judicially stricken." *Id.,* 124 N.H. at 619–20, 475 A.2d at 12. (citing cases).

In *Hydraform Products Corp. v. Amer. Steel,* 127 N.H. 187, 193, 498 A.2d 339, 344–345 (1985), on the other hand, the court deemed the availability of consequential damages to be dependent on whether the limited remedy had failed of its essential purpose, since the contract's limited remedy and limitation on consequential damage terms were placed together in the same contractual provision. The court in *Hydraform* reasoned that since the parties only agreed to eliminate the right to consequential damages if replacement or refund served as effective remedies, they could not "view this as a case in which the . . . limitation of damages clause should be determined independently of the provision for replacement or refund." *Id.*

■ Here, however, the limitation of damages is in Section 11.4 of the Agreement, and the remedy for breach is contained in Section 8.2 of the Agreement. Thus, these provisions cannot be construed as dependent upon one another on their face. Therefore, given the absence of any other evidence on this point, the approach taken by the New Hampshire Supreme Court in *Hydraform* would not seem to apply to this case. Rather, the Court will follow the approach articulated in *Xerox,* and treat the remedy and limitation of damages portions of the Agreement as independent. Therefore, the Court need not consider whether the remedy contained in Section 8.2 of the Agreement failed of its essential purpose, in order to determine the availability of consequential or incidental damages. Whether the limitation of damages in Section 11.4 of the Agreement is unconscionable, and therefore not binding under § 2–719(3); remains the only critical inquiry.

■ The question of unconscionability is one of law to be determined by the Court. N.H.REV.STAT.ANN. § 382A:2–302, Official Comment 1 (1991). "A limitation or exclusion of consequential damages is enforceable unless unconscionable, but such a loss is not prima facie unconscionable where the loss is commercial." *Hydraform Prod. Corp.,* 127 N.H. 187, 194, 498 A.2d 339, 343 (1985); N.H.REV.STAT.ANN. 382–A:2–719(3). In this case, the loss is commercial, thus the exclusion is not prima facie unconscionable.

The comments to § 2–302 of the Code describe unconscionability as a one-sidedness that must be analyzed "in light of the general commercial background and the commercial needs of the particular trade or case. . . . The principle is one of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power." *Hydraform Prod.,* 127 N.H. at 194, 498 A.2d at 343 (quoting N.H.REV.STAT. ANN. 382–A:2–302, Official comment 1 (1991)). In the commercial setting, "courts dealing with unconscionability claims have espoused the principle that the parties ought to be left free to make their own agreements in the absence of fraud or overreaching." *Public Service Co. of N.H. v. Westinghouse Elec. Corp.,* 685 F.Supp. 1281, 1288 (D.N.H. 1988). "The issue of overreaching tends to turn on whether the bargaining power is so disparate that the weaker party is left without any genuine choice." *Hydraform Prod.,* 127 N.H. at 195, 498 A.2d at 344. The burden of proof is upon the buyer to show that there is an issue of fact as to unconscionability. *Xerox Corp. v. Hawkes,* 124 N.H. 610, 618, 475 A.2d 7, 10 (1984).

■ Given the standards applicable in assessing claims of unconscionability, the Court cannot hold that Section 11.4 of the Agreement, limiting damages, is unconscionable as a matter of law. EDS and Chubb are sophisticated business entities, who extensively negotiated each provision of the Agreement in dispute in this case. *See, e.g., American Elec. Power Co. v. Westinghouse Elec. Corp.,* 418 F.Supp. 435, 458 (S.D.N.Y.1976) ("[T]he contract here in issue is not of the type entered into by the average consumer, but a commercial agreement painstakingly negotiated between industrial giants.") The doctrine of unconscionability "is of questionable

applicability if the transaction involves a large sum of money because the buyer retains 'impressive negotiation power,'" *Public Service Co. of N.H.*, 685 F.Supp. at 1288.

Here, the contract for the license of EDS' twenty-one million dollar Insurance Machine prompted Chubb to retain the assistance of an independent consulting firm, the Index Group. Months of negotiations and numerous communications preceded execution of the Agreement. (Haller Dep., January 14, 1991, p. 2–46, *et seq, id.*, May 14, 1991, p. 2–73). During these negotiations, Chubb was also represented by legal counsel, which assistance has been cited as a factor precluding a finding of unconscionability. (*Id.*, May 14, 1991, p. 2–45, 2–50; Flowers Dep., January 13, 1991). *See Public Service Co. of N.H.*, 685 F.Supp. at 1289 (quoting *K & C, Inc. v. Westinghouse Elec. Corp.*, 437 Pa. 303, 263 A.2d 390, 393 (1970)) ("unconscionability denied as to exclusion of consequential or special damages because loss was commercial and contracting parties included experienced attorneys: 'buyer was hardly the sheep keeping company with wolves that it would have us believe'"). Chubb's prior experience in contracting for data processing services [8] also militates against a finding of unconscionability, (*Id.*, January 15, 1991, p. 3–5 to 3–8), since it is hardly an "innocent in the industry." *See Hydraform Prod.*, 127 N.H. at 195, 498 A.2d at 344.

The Court finds that the limitation of damages set out in Section 11.4 of the Agreement is not unconscionable as a matter of law under N.H.REV.STAT.ANN. §§ 382–A:2–719(3) and 2–302. To rule otherwise would disturb the parties' agreed upon allocation of risk.

Although the limitation of damages clause is valid as a matter of contract law, the clause is not necessarily binding as a matter of law, since there are limits to the enforceability of such clauses. Specifically, "wanton and willful conduct intended to harm is not subject to the limitation of liability." *PK's Landing v. New England Tel.*, 128 N.H. 753, 757, 519 A.2d 285, 287 (1986); *cf. RRX Industries, Inc. v. Lab–Con, Inc.*, 772 F.2d 543 (9th Cir.1985) (damage limitation ignored where breach "total and fundamental"); *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442 (S.D.N.Y. 1986) (damage limitation invalid when defendant acts fraudulently or in bad faith). The New Hampshire Supreme Court has not yet decided whether fraud, bad faith, or a "total and fundamental" breach nullifies a contractual limitation on damages. However, when a state court has not directly ruled on the issue under consideration, "it becomes our duty to vaticinate how the state's highest tribunal would solve such matters." *Moores v. Greenberg*, 834 F.2d 1105, 1107 (1st Cir. 1987). "Our function is not to formulate a tenet which we, as free agents, might think wise, but to ascertain, as best we can, the rule that the state's highest tribunal would likely follow." *Kathios v. General Motors Corp.*, 862 F.2d 944, 949 (1st Cir.1988).

Were the New Hampshire Supreme Court confronted with this issue, it would likely find persuasive the principle that a defendant is generally precluded from relying on limitation provisions of a contract entered into as a result of fraudulent actions on the defendant's part. Limitations of damages for breach would likely be held ineffective when a party acts fraudulently, or in bad faith. *See* 6A Corbin on Contracts § 1472 at 606 (1992); *see also Long Island Lighting supra; Clements Auto Co. v. Service Bureau Corp.*, 444 F.2d 169, 188 (8th Cir.1971).[9] Similarly, a "total and fundamental" breach would likely be held to nullify damage limitations in a contract. *See RRX Industries*, 772 F.2d at 547; *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1375 (9th Cir.1978). Therefore, it follows that the contractual limitation of liability is not enforceable under New Hampshire law if plaintiff's claim of

---

**8.** In Chubb's reply to EDS' objections to its Motion for Partial Summary Judgment, also pending before the Court, Chubb concedes that "it is beyond dispute that [Chubb] was involved in data processing projects prior to its entering into a contract with EDS." (document no. 51.1 at p. 4).

**9.** This principle of law is further supported by N.H.REV.STAT.ANN. § 382–A:2–721, which provides that "remedies for material misrepresentation or fraud include all remedies available under this Article for non-fraudulent breach."

fraud, bad faith and/or "total and fundamental" breach is proven at trial.

If EDS is shown to have acted fraudulently, in bad faith or in a "willful and wanton" manner, the "protection afforded by the limitation of liability clause [will] not be available." *PK's Landscaping*, 128 N.H. 753, 757, 519 A.2d 285, 288; *see also* Corbin on Contracts § 1472 *supra; Long Island Lighting Co.*, 646 F.Supp. 1442, 1458 ("[A] defendant is estopped from asserting a contractual limitation of consequential damages if the defendant has acted in bad faith.").

■ Here, Chubb has made allegations against EDS which give rise to a material factual issue: whether EDS knowingly sold a product, the Insurance Machine, which was defective due to its undeveloped status at the time of contract. Chubb's allegations,[10] if eventually proven, would render the damage limitation contained in Section 11.4 unenforceable.

Accordingly, although the Court holds that the limitation on damages contained in section 11.4 of the Agreement is not unconscionable as a matter of law under § 382–A:2–719(3) of the Code, neither are those limitations necessarily binding as a matter of law, in light of the factual dispute regarding the status of, and representations regarding the capability of, the Insurance Machine. Resolution of this factual dispute at trial is a prerequisite to determining whether EDS' conduct was in bad faith, and, in turn, whether the limitation of damages is enforceable.

Nor does the Court pass judgment on the availability of non-consequential, or direct damages, under N.H.REV.STAT.ANN. 382–A:2–719(2), if the remedy under the Agreement is found to have failed of its essential purpose at trial. What constitutes consequential, or incidental, as opposed to direct damages is a factual issue which must be decided at trial. *See Amer. Elec. Power. Co.*, 418 F.Supp. at 459. The scope of direct damages recoverable by Chubb, should it prevail at trial, must provide a "minimum adequate remedy." N.H.REV.STAT.ANN. § 382–A:2–719(2), Official Comment 1, (1991).

### 3. Limitation of Warranties

■ EDS seeks a ruling that Chubb's express warranty claim fails because the express warranties, by their own terms, never became effective. Chubb and EDS assert different interpretations of the limitation on express warranties contained in the Agreement. EDS maintains that the warranty provisions contained in Sections 8.2 and 8.4, *supra*, are the sole provisions intended to control the warranty of the Insurance Machine. Chubb, on the other hand, argues that Section 2.1 of the Agreement incorporates by reference pages 7–62 of the EDS Proposal, which contains numerous express warranties, arguably binding on the parties. EDS counters that Section 2.1 was incorporated for the sole purpose of defining the term, "Basic Documents," and not to grant express warranties.

The New Hampshire Supreme Court has held that a contract clause "is ambiguous when the contracting parties reasonably differ as to its meaning." *Laconia Rod & Gun Club v. Hartford Accident and Indem. Co.*, 123 N.H. 179, 182, 459 A.2d 249, 251 (1983). And, as the Court of Appeals for the First Circuit has noted, "the general rule is that whether the contract is clear or ambiguous is a question of law.... If the contract is deemed to be ambiguous, then the intention of the parties is a question of fact." *Re Navigation Technology Corp.*, 880 F.2d 1491, 1495 (1st Cir.1989).

In light of the facts presently available, the Court finds as a matter of law that Section

---

**10.** Chubb has called the Court's attention, *inter alia*, to "Project 270," a project apparently started by EDS after the contract with Chubb was signed, to obtain the functionality that EDS had previously represented as being present in the Insurance Machine; to the "Insurance Machine Certification," dated March 8, 1989, the first sentence of which reads, "the purpose of the base certification test effort is to verify the stability of the Insurance Machine functionality before continuing with customer-unique modifications"; and to the affidavit of Henry Boucher, who testified as an expert in the United States District Court for the Northern District of Texas on May 20, 1992, in the trial of *Electronic Data Systems Corporation v. Life Insurance Company of Georgia,* and who expects to testify in this case, as to the undeveloped status of the Insurance Machine.

2.1 of the Agreement, incorporating pages 7–62 of the proposal, is ambiguous, since it is subject to differing reasonable interpretations as it relates to the express warranties contained in the Proposal. This ambiguity presents a genuine issue as to a material fact, which precludes summary judgment on Chubb's breach of express warranty claim at this juncture.

### 4. Chubb's Breach of Contract

#### a. Election to Continue Contract

EDS argues that by continuing to accept EDS' services long after becoming aware of EDS' alleged breach of contract, Chubb elected to continue the contract and waived any right that it may have had to terminate the Agreement. Therefore, EDS argues, when Chubb suspended monthly payments and ordered EDS off its premises, Chubb breached the Agreement as a matter of law. This entire argument is predicated on questions of fact lying at the heart of this lawsuit: Whether and when EDS breached the Agreement, and whether EDS ever tendered delivery of its Insurance Machine?

"The existence of a breach is usually a question of fact to be determined by the circumstances of each case." *Kline v. Burns*, 111 N.H. 87, 93, 276 A.2d 248, 252 (1971). The issue of what "constitutes a reasonable time within which to give notice to the seller of a breach ... is a question of fact for the jury." *Fairhaven Textile Corp. v. Sheehan, Phinney, Bass & Green*, 695 F.Supp. 71, 77 (D.N.H.1988). Also, whether or not Chubb waived its right to terminate the contract is a question of fact. *Boston Helicopter Charter v. Agusta Aviation Corp.*, 767 F.Supp. 363, 372 (D.Mass.1991). Therefore, the propriety of Chubb's termination of the contract cannot be determined as a matter of law at this juncture and summary judgment is denied on that issue.

#### b. Failure to Comply with Notice Provisions

EDS seeks a ruling that Chubb breached the Agreement by failing to comply with the contractual notice requirements for termination of the Agreement. Prior to the filing of its lawsuit, Chubb apparently neither notified EDS of its intention to commence litigation, nor did it provide written notices of default and termination to EDS.[11] Chubb does not deny that it failed to comply with these contractual prerequisites. Nonetheless, Chubb maintains that since EDS could not live up to its contractual obligations, and it is "beyond dispute" that EDS knew of its own default, Chubb was excused from performance of the futile act of noticing a default and termination.

For the reasons articulated in the previous section of this Order, the Court cannot determine the propriety of Chubb's termination of the contract, or whether the notice provisions were excused as futile or were substantially complied with, at this juncture, since those issues are inextricably intertwined with the issue of breach, which is a question of fact.

### 5. Alternative Dispute Resolution Clause

EDS maintains that Chubb's alleged failure to comply with the Alternative Dispute Resolution clause in Section 10.1 of the Agreement bars litigation at this time. The pertinent language of Section 10.1 provides:

"[n]o formal proceedings for the judicial resolution of the dispute may be commenced *until the designated corporate officers conclude in good faith that amicable resolution through continued negotiation of the matter in dispute does not appear likely.* Said officers agree to consider, and *if mutually agreeable, select binding arbitration in lieu of any litigation* regarding any dispute herein" (emphasis added).

It is apparent that the parties were not able to come to an agreeable resolution of their dispute. Both parties concede that EDS' Account Manager and Chubb's Management met periodically to resolve disputes. (Chubb's opp. p. 49, EDS' reply p. 19.) But, EDS argues that Chubb was still required to appoint a representative to consult with EDS before resorting to litigation. In light of the

---

**11.** Section 10.6 of the Agreement requires notice of default, which, if not substantially cured within sixty (60) days, authorizes the non-defaulting party to terminate the Agreement by giving written notice to the defaulting party.

ongoing negotiations between the two parties regarding the resolution of disputes, the Court finds that Chubb substantially complied with Section 10.1 of the Agreement.

The language of Section 10.1 hardly requires mandatory binding arbitration prior to the commencement of a judicial proceeding. It merely calls for "consideration" of binding arbitration, which is to be pursued only if "mutually agreeable." That language would not qualify as a mandatory "provision ... to settle by arbitration a controversy thereafter arising out of such contract" within the meaning of New Hampshire's Arbitration Agreement statute. *See* N.H.REV.STAT. ANN. 542:1 (1991).

Accordingly, EDS' motion for summary judgment on the basis that Chubb's claims are barred due to its failure to comply with Section 10.1 of the Agreement is denied.

*Conclusion*

The Court holds that Article 2 of the Uniform Commercial Code, as adopted in New Hampshire, N.H.REV.STAT.ANN. § 382–A:2 (1991), applies to the Agreement between EDS and Chubb. The Court finds the limitation on damages, contained in Section 11.4 of the Agreement, valid as a matter of contract law. However, the Court does not affirmatively rule that Chubb's damage request will be limited by this provision at trial. EDS' motion for summary judgment on the basis that Chubb's breach of express warranty claim fails, is denied. In addition, EDS' motion is denied to the extent that it requests the Court to determine whether Chubb breached the terms of the Agreement. Finally, Chubb's claims are not barred by the arbitration provision of the Agreement.

For the foregoing reasons, EDS' Motion for Partial Summary Judgment (document no. 51) is herewith denied.

SO ORDERED.